**INDIANA PATIENT'S COMPEN-SATION FUND, Appellant–Defendant,**

v.

**Eric BUTCHER and Dorothy Butcher, Individually and as Parents and Natural Guardians of Samuel L. Butcher, Deceased Minor, Appellees–Plaintiffs.**

No. 49A02–0603–CV–223.

Court of Appeals of Indiana.

March 16, 2007.

Susan E. Cline, Julia Blackwell Gelinas, Maggie L. Smith, Locke Reynolds, LLP, Indianapolis, IN, Attorneys for Appellant.

Jerry Garau, Deborah K. Pennington, Findling Garau Germano, & Pennington, P.C., Indianapolis, IN, Attorneys for Appellees.

Thomas J. Costakis, Greg A. Small, Krieg DeVault, LLP, Indianapolis, IN, Attorneys for Amicus Curiae, Indiana State Medical Association.

Kathryn E. Cordell, Angela M. Smith, Hall Render Killian Heath & Lyman, P.C., Indianapolis, IN, Attorneys for Amicus Curiae, Indiana Hospital & Health Association.

## OPINION

BARNES, Judge.

### Case Summary

The Indiana Patient's Compensation Fund ("the Fund") appeals the trial court's order of judgment collectively awarding Eric, Dorothy, and Samuel Butcher $3,500,000 for an act of medical malpractice. We reverse and remand.

### Issues

The Fund raises three issues, which we consolidate and restate as:

I.    whether the evidence supports the trial court's finding that Dorothy sustained physical injuries as a result of the malpractice; and

II.   whether Eric and Dorothy are entitled to their own, separate caps under the Medical Malpractice Act ("the Act") for injuries they suffered as a result of the malpractice leading to Samuel's death.

### Facts

In June 2003, when she was approximately thirty-eight weeks pregnant, Doro-

thy was involved in an automobile accident. Following the accident, she was taken to Sullivan County Community Hospital ("SCCH"). While at SCCH, Dorothy began having contractions. Dr. Pardeep Kumar, the doctor attending to Dorothy at SCCH, contacted Dr. Scott Stine, the physician managing Dorothy's pregnancy, and after communicating to Dr. Stine that the fetus's heart tones were "reassuring" Dr. Stine agreed that Dorothy should be transported to Good Samaritan Hospital ("Good Samaritan") in Vincennes so that Dr. Stine could oversee her labor and delivery. Ex. 18, p. 13. When Dorothy arrived at Good Samaritan, neither the nursing staff nor Dr. Stine was able to locate any fetal heart tones. Dorothy underwent an emergency cesarean section to deliver Samuel. Samuel was not breathing and had no pulse. Samuel was eventually resuscitated, placed on a ventilator, and transferred to the neonatal intensive care unit at another, larger hospital. The Good Samaritan staff informed Eric and Dorothy that Samuel's condition was critical.

Eric accompanied Samuel to the neonatal intensive care unit, but Dorothy stayed at Good Samaritan to recover from her surgery. She and Eric stayed in frequent contact over the telephone. Within a couple of days, Eric and Dorothy decided to terminate Samuel's life support, and he died. Dorothy did not have an opportunity to hold Samuel before he died and was not able to spend time with him while he was alive.

In July 2004, Eric and Dorothy filed a proposed complaint with the Indiana Department of Insurance alleging negligence by Dr. Kumar and SCCH resulting in Samuel's wrongful death, Dorothy's physical injuries and emotional distress, and Eric's emotional distress. In July 2005 the parties entered into a settlement agreement. Eric and Dorothy then filed a petition for payment of damages from the Fund.

On February 1, 2006, a bench trial was conducted. The trial court issued findings of fact and conclusions thereon and entered individual judgments in the amount of $1,250,000 each for Samuel, Dorothy, and Eric. The trial court subtracted from the total judgment the amount previously paid by the providers pursuant to the settlement agreement and ordered the Fund to pay the Butchers $3,500,000. The Fund appeals.

**Analysis**

**I. Dorothy's Injuries**

The Fund first argues that the evidence does not support the trial court's finding that Dorothy sustained physical injuries as a result of Dr. Kumar's and SCCH's negligence. We agree.

When, as here, the trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Anthony v. Indiana Farmers Mut. Ins. Group*, 846 N.E.2d 248, 252 (Ind.Ct.App.2006). First, we consider whether the evidence supports the findings. *Id.* In doing so, we liberally construe the findings in support of the judgment, and determine whether the findings are clearly erroneous. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Nieto v. Kezy*, 846 N.E.2d 327, 332 (Ind.Ct.App.2006) (quotation omitted) (citation omitted).

The second step in our review is to determine whether the findings support the judgment. *Anthony*, 846 N.E.2d at 252. If a judgment relies on an incorrect standard, it is clearly erroneous. *Nieto*, 846 N.E.2d at 332. We do not defer to the trial court's conclusions of law. *Id.* at 333. We do not reweigh the evidence and must

consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Id.*

With regard to Dorothy's physical injuries, the trial court's findings and conclusions provide in part:

## II.  *FINDINGS OF FACT*

7.  The doctors [at Good Samaritan] could not wait for anesthesia services because of the urgent need to deliver the baby.  Dorothy's emergency surgery was performed under local anesthetic, consequently Dorothy felt the pain of the incision.  As a result of the urgency of the surgery, Dorothy had extensive scarring, adhesions, and a more painful recovery—more so than she would have experienced with a Cesarean delivery under normal circumstances.

\*     \*     \*     \*     \*     \*

## II.  *CONCLUSIONS OF LAW*

\*     \*     \*     \*     \*     \*

■  17.  The court finds that Dorothy Butcher is entitled to recover an additional $1,250,000 for her distinct emotional distress injury and any physical injury she suffered as a result of the health care provider's act of malpractice.

App. pp. 7, 18.  In addition to arguing that this finding is not supported by the evidence, the Fund also correctly points out in its response brief that the Butchers have failed to respond to this argument in their appellees' brief.  "An appellee's failure to respond to an issue raised in an appellant's brief is, as to that issue, akin to failing to file a brief." *Nance v. Miami Sand & Gravel, LLC,* 825 N.E.2d 826, 837 (Ind.Ct.App.2005), *trans. denied.*  Consequently, the Fund must merely establish that the trial court committed prima facie error in order for us to reverse. *Id.* "Pri-

ma facie" refers to error that we are able to ascertain "at first sight, on first appearance, or on the face of it." *Id.*

We first address the portion of the trial court's findings that provides Dorothy endured physical suffering "more so than she would have experienced with a Cesarean delivery under normal circumstances." App. p. 7.  During his deposition, Dr. Stine testified:

The baby was alive and in distress at the time they did their fetal heart monitor and the evaluation of that strip [at SCCH] and I have seen that fetal heart evaluation is obviously what is called a sinusoidal pattern, that means that baby has sustained injury, is in distress and is kind of making the final last minute gasps for life. . . .

\*     \*     \*     \*     \*     \*

[I]f there is disaster, even if there is a crisis, you got about seven to ten minutes to get that baby out. . . . If they had an emergent [sic] cesarean delivery at the time that they had that strip then baby probably would have been fine.

Ex. 18, pp. 126–27.

Regardless of whether Dorothy had delivered Samuel at SCCH immediately following her traffic accident or, as it was, later at Good Samaritan, she would not have delivered Samuel "under normal circumstances," and would have undergone an emergency cesarean section.  Therefore, it is incorrect to compare the physical injuries actually suffered by Dorothy to those that she would have experienced "under normal circumstances."  Instead, we must determine whether Dorothy endured *more* physical suffering that she would have absent the malpractice.

Viewing Dorothy's injuries in this manner is consistent with the perspective courts must take when determining wheth-

er a plaintiff has proven the elements of medical malpractice. In addition to establishing that the healthcare provider breached a duty, a plaintiff must also prove that the provider's breach proximately caused a compensable injury. *Hassan v. Begley*, 836 N.E.2d 303, 307 (Ind.Ct.App.2005). "If the plaintiff proves the elements of negligence, he is entitled to all damages naturally flowing from the healthcare provider's breach of duty." *Id.* Here, even absent Dr. Kumar's and SCCH's negligence, Dorothy would not have delivered Samuel under normal circumstances; she would have had emergency surgery in any instance. As such, we must consider whether Dorothy suffered physical injuries as a result of the malpractice that she would not have suffered if she had undergone a timely emergency cesarean delivery at SCCH. There is no evidence to support such a conclusion.

Turning our attention to the specifics of the findings of fact, we next address the finding: "Dorothy's emergency surgery was performed under local anesthetic, consequently Dorothy felt the pain of the incision." App. p. 7. This statement appears to be an oversimplification of the evidence presented to the trial court. Both Dorothy's trial testimony and Dr. Stine's deposition testimony clearly provide that although Dorothy's cesarean section began before the anesthesiologist arrived, she did receive general anesthesia and was fully anesthetized and unconscious by the time Samuel was delivered. Although we do not doubt that Dorothy experienced discomfort as a result of the hurried nature of her surgery, there is no evidence that the circumstances surrounding her anesthetization would have been different absent the malpractice.

The trial court next found that Dorothy's emergency surgery resulted in "extensive scarring, adhesions, and a more painful recovery...." App. p. 7. There is no evidence indicating that these conditions were caused by the malpractice. Speaking about emergency Cesarean deliveries in general, Dr. Stine testified that because Dorothy underwent a

> stat cesarean section ... cosmetically her results are not as nice because of the type of incision and comfort wise, her scarring, abdominal pain is going to be a bit worse than what the average cesarean section is because of the way we do it, a stat cesarean section, we are not quite as detail oriented, we want baby out as quickly as possible and so the way we separate tissues and so forth is much more emergent and therefore sometimes we have more pain, more stretching, more scarring.

\*   \*   \*   \*   \*   \*

> Most women with cesarean deliveries will be up and out of bed the next day because we don't have to cut as much muscle and tissue and when it's done emergently there is more muscle cut, more tissue cut. The recovery is more protracted.

Ex. 18, pp. 65–66.

█  Speaking specifically about Dorothy's condition, however, Dr. Stine testified that he was not aware of "any type of resultant functional defect or injury from this delivery." *Id.* at 66. Similarly, Dorothy's medical records indicate that while she was in the recovery room, her pain was managed well; that at the time she was discharged her pain goal was met; and that on August 4, 2003, Dorothy was not experiencing abdominal pain and was able to do some lifting.

Dorothy's medical records further specify her diagnosis upon discharge as

1. Emergency cesarean section secondary to placental abruption and fetal distress.

2. Primary cesarean section.

3. Placental abruption after blunt abdominal trauma following motor vehicle accident.

4. Motor vehicle accident with abdominal trauma, low back pain and neck pain

\*     \*     \*     \*     \*     \*

6. Grief reaction with depression.

7. Chest pain and shortness of breath, ruled out for pulmonary embolus.

Ex. D. Like the other evidence we have discussed, the notes related to Dorothy's discharge diagnosis make no reference to any difficulties she may have suffered as a result of the malpractice.

With the exception of Dr. Stine's general statements regarding the differences between "average" and emergency cesarean sections, our review of the evidence reveals no mention of "extensive scarring, adhesions, and a more painful recovery," let alone evidence that Dorothy herself suffered from these complications as a result of the malpractice. The evidence does not support the trial court's finding that Dorothy suffered any physical injuries "naturally flowing" from Dr. Kumar's and SCCH's malpractice. *Chaffee*, 751 N.E.2d at 780. As such, it was prima facie error for the trial court to conclude that any portion of Dorothy's damages award should be premised on the physical injuries she suffered from the emergency cesarean section.

1. Indiana Code Section 34–18–14–3(a) sets out the recovery limitations applicable to medical malpractice actions.

2. Under different facts, it is possible we could have concluded that Dorothy, too, was an actual victim of malpractice entitled to recov-

## II. Eric's and Dorothy's Separate Caps

We now turn to the question of whether Dorothy and Eric were each entitled to recover under separate caps under the Act for the injuries they suffered as a result of the malpractice that led to Samuel's death.[1] We have already determined there is no evidence that Dorothy suffered any physical injuries as a result of the providers' malpractice and may not recover in that regard. Like Eric, then, Dorothy's only viable damages claim must be based on her emotional suffering related to Samuel's death.

The Fund concedes that both Eric and Dorothy were entitled to assert claims for emotional distress, and it does not challenge the trial court's findings that Eric and Dorothy suffered emotional distress as a result of the malpractice. The Fund further concedes that "upon proper proof, they were entitled to damages based upon that emotional distress." App. Br. p. 7. Therefore, the only issue we must address is whether Eric and Dorothy are each entitled to receive maximum damages for their injuries under separate caps as provided by the Act. We conclude that they are not. We hold that although Eric and Dorothy, individually and on behalf of Samuel, have valid claims for which they may be entitled to recover, that recovery is limited to the statutorily-dictated cap for "the injury or death suffered by the actual victim of the malpractice." *Goleski v. Fritz*, 768 N.E.2d 889, 891 n. 1 (Ind.2002). Here, the actual victim of the malpractice is Samuel.[2]

er her own statutory cap for her claims. Those facts are not before us, however. Here, Samuel is the only actual victim of malpractice. Because there is only one actual victim of malpractice, the Butchers' recovery for all of their claims must be limited to one cap.

At the outset, we note that in its appellate brief, the Fund presented this question as two separate issues:

1. Whether a parent's claim for emotional distress attributable to the death or injury of their child is a derivative claim rather than a separate and independent injury to the parent.

2. Whether the characterization of a parent who has received no medical care as a "patient" for purposes of standing to assert a derivative claim for emotional distress transforms the parent into a "patient" for purposes of entitlement to multiple statutory caps.

Appellant's Br. p. 1.

We have chosen to refocus the Fund's framing of the issue because we conclude that the Indiana Supreme Court has provided us with a slightly different framework for analyzing this question. Therefore, it is not necessary for us to determine whether Eric and Dorothy are "patients" who may assert claims but not "patients" who may recover multiple caps. Further, during the pendency of this case, another panel of this court addressed the question of whether negligent infliction of emotional distress claims are "independent" torts and held that such claims are "not contingent upon proof of a separate, underlying tort." *State Farm Mut. Auto. Ins. Co. v. Jakupko*, 856 N.E.2d 778, 784 (Ind.Ct.App. 2006), *trans pending*. We mention this decision because it is relevant to the parties' treatment of the issues. Our holding, however, is not premised on *Jakupko*, which was not a medical malpractice case. We instead rely on the authority provided by our supreme court in *Goleski*.[3]

■ At the heart of the conflict in this case are two provisions from the Act.

Indiana Code Section 34–18–14–3(a), the statute that sets out recovery limitations in medical malpractice suits, provides in part: "The total amount recoverable for an injury or death of a patient may not exceed the following: ... One million two hundred fifty thousand dollars ($1,250,000) for an act of malpractice that occurs after June 30, 1999. ..." The Act defines "patient" as:

> [A]n individual who receives or should have received health care from a health care provider, under a contract, express or implied, and includes a person having a claim of any kind, whether derivative or otherwise, as a result of alleged malpractice on the part of a health care provider. Derivative claims include the claim of a parent or parents, guardian, trustee, child, relative, attorney, or any other representative of the patient including claims for loss or services, loss of consortium, expenses, and other similar claims.

Ind.Code § 34–18–2–22.

In *Indiana Patient's Compensation Fund v. Wolfe*, 735 N.E.2d 1187 (Ind.Ct. App.2000), *trans. denied*, this court addressed an issue related to that presented in this case: "whether a parent who has a derivative claim, based on loss of services, constitutes a 'patient' under Indiana Code Section 34–18–2–22 and is therefore entitled to a separate statutory damages cap under the Act." *Id.* at 1189. In that case, William and Christine Wolfe filed a medical malpractice claim alleging that their infant son, Thomas, suffered brain damage during his delivery; Christine suffered emotional injuries; and William and Christine suffered the loss of Thomas's services.

---

**3.** The trial court entered thorough conclusions of law related to this issue, and we commend it for its efforts since such conclusions aid us a great deal in our review. We do not, however, defer to the trial court's conclusions of law and review them de novo. *Young v. Adams*, 830 N.E.2d 138, 141 (Ind.Ct. App.2005), *trans. denied*.

After the Wolfes reached a settlement with the healthcare providers, the Wolfes sued the Fund to recover excess damages. On appeal, the Fund argued that, with regard to their derivative claims, William and Christine were not patients as defined by the Act and that Thomas was the only patient. *Id.* at 1192. As such, the Fund further argued that "any derivative claim that might arise from the malpractice committed on the patient is included within that patient's claim." *Id.*

The *Wolfe* court agreed. In reaching its conclusion, the court construed Indiana Code Section 34–18–2–22's definition of "patient" and stated:

The term "means" is defined as "2. To intend to convey or indicate." Thus, the legislature's use of "means" in the first portion of the definition indicates that "an individual who receives or should have received health care" is the definition of the term "patient." The legislature goes on to state that the definition of "patient" "includes" those with derivative claims. "Includes" is defined as "1. To take in as a part, an element or a member. 2. To contain as a secondary or subordinate element." Thus, the legislature's use of the word "includes" expresses its intent that those with derivative claims are a part of the whole patient, and not patients in and of themselves. In other words, a "patient" is a person who receives or should have received health care; a subset of that definition is composed of those with derivative or any other claims. Further support for our interpretation of the statute is found in the second sentence of the legislature's definition of patient. In that sentence, the legislature defined a derivative claim as "the claim of a parent or parents . . . or any other representative of the patient including claims for loss of services, loss of consortium, expenses, and other simi-

lar claims." Because the legislature described a derivative claim as the claim of a parent or any other representative of the patient, the legislature could not have intended the parent to also fall under the definition of "patient." Thus, our reading of the plain language of Indiana Code section 34–18–2–22 leads us to the conclusion that a derivative claimant is a subset of the patient and not a patient unto himself.

*Id.* at 1192 (citations omitted).

Based on its construction of the Act, the court held that 1) Thomas was a patient; 2) to the extent that Christine was a patient, she could not recover because she was not the patient who was injured or died from the act of malpractice as contemplated by Indiana Code Section 34–18–14–3(a); and 3) that William was not a patient. *Id.* at 1192. The court further held that because neither William nor Christine was a patient with regard to their loss of services claims, these derivative claims were "subsumed within Thomas's action." *Id.* at 1193.

The next substantive treatment of this issue came from our Supreme Court in *Goleski.* Although the issues in that case were unrelated to those in Eric and Dorothy's case, the *Goleski* court discussed the *Wolfe* court's construction of Indiana Code Section 34–18–2–22 and the use of the word "patient" in the statute that caps a medical malpractice plaintiff's damages. *See Goleski,* 768 N.E.2d at 891 n. 1. The *Goleski* court sanctioned the outcome in *Wolfe,* but it disapproved of the *Wolfe* court's rationale to the extent *Wolfe* suggested "that a derivative claimant is not a 'patient' for purposes of ability to assert a claim under [Indiana Code Section 34–18–8–1]." *Id.* The *Goleski* court specifically stated, "we think that derivative claimants

are 'patients' within the meaning of section 34–18–8–1." *Id.*

These portions of the *Goleski* footnote refer specifically to a *derivative* claimant's ability to file a medical malpractice claim. However, the court used broader language, the application of which we do not believe is limited to derivative plaintiffs, in construing Indiana Code Section 34–18–14–3, the recovery caps statute. In that regard, our supreme court stated:

> Although there may be persons who are statutorily defined to be "patients" and therefore may assert derivative claims for their own damages under the Act, section 34–18–14–3(a) applies the damages cap to all claims, whoever may assert them, for a single "injury or death of a patient." The only "injury or death" within the meaning of this section is the injury or death suffered by the actual victim of the malpractice.

*Id.*

Clearly, the *Goleski* court believed that the ability to file a medical malpractice action should be available to a wide range of potential claimants, derivative or otherwise, and the court does not seem to take issue with the possibility that these varied claimants could recover provided they are able to meet their burden of proof. What *Goleski* appears to curb is the number of maximum recoveries a claim may produce, and it limits the number of maximum recoveries to the number of injuries or death "suffered by the *actual victim of the malpractice.*" *Id.* (emphasis added). In other words, myriad potential claimants may bring a malpractice action, and any successful plaintiff may be awarded damages. However, the actual recovery for those

damages must be limited to one statutory maximum for each actual victim of malpractice who suffers an injury or death. In this case, the only actual victim of Kumar's and SCCH's malpractice was Samuel.

This reading of the *Goleski* footnote is consistent with other cases in which Indiana courts have considered the number of caps available in cases involving varied numbers of injuries resulting from varied numbers of negligent acts. In *McCarty v. Sanders,* 805 N.E.2d 894 (Ind. Ct.App.2004), *trans. denied,* which consolidated the claims of three groups of plaintiffs, we addressed the issue of whether the plaintiffs could recover from the Fund "for multiple injuries under separate statutory caps after a single statutory minimum payment has been made by the health care provider."[4] *Id.* at 896. In that case, single acts of negligent treatment rendered to two women, each pregnant with twins, resulted in death or injuries, including brain damage and hypothyroidism, to each mother and her infants.

The portions of *McCarty* that interpret the statute dictating a healthcare provider's liability are inapplicable to the case before us. However, to the extent *McCarty* approved of the trial court's determination that the six plaintiffs should each receive his or her own recovery cap because there was more than one injury, that rationale is consistent with our holding here. Each of the *McCarty* plaintiffs—each mother and the four infants—was an actual victim of the malpractice.

In *Medical Assurance of Indiana v. McCarty,* 808 N.E.2d 737 (Ind.Ct.App. 2004), Mary Barker filed a malpractice

---

4. Indiana Code Section 34–18–14–3(b) provides: "A health care provider qualified under this article (or IC 27–12 before its repeal) is not liable for an amount in excess of two hundred fifty thousand dollars ($250,000) for

an occurrence of malpractice." This statute previously limited a healthcare provider's liability to $100,000. *See McCarty,* 805 N.E.2d 894 at 898.

action against her healthcare provider alleging that he was negligent in two ways during one surgery: he left a hemoclip inside her abdomen and sutured her colon in such a way that it leaked into her abdominal cavity. *Id.* at 739. Following a trial, a jury awarded Barker $1,800,000. *Id.* The trial court reduced Barker's award to $1,500,000—$750,000, the statutory cap at the time, for each act of malpractice and resulting injury. *Id.* at 740.

As in *McCarty v. Sanders,* the issue before the court in *Medical Assurance* focused on Barker's healthcare provider's liability under Indiana Code Section 34–18–14–3(b). *Id.* at 739. The discussion of that statute is, again, inapposite to the issues in Eric and Dorothy's case. However, we point out that our holding here does not contradict the rationale for Barker's award in *Medical Assurance.* Even though Barker was the only claimant in her malpractice action, she was the actual victim of two acts of malpractice. We note similar outcomes in other cases involving varying numbers of negligent acts and injuries. *See St. Anthony Med. Ctr. v. Smith,* 592 N.E.2d 732, 739 (Ind.Ct.App. 1992), *trans. denied* (concluding plaintiff was entitled to only one cap when two separate acts of malpractice resulted in only one injury or death); *Miller v. Mem'l Hosp. of South Bend,* 679 N.E.2d 1329, 1332 (Ind.1997) (concluding plaintiff was entitled to only one cap when two separate healthcare providers each committed one act of malpractice resulting in only one injury).

The Act's goal is to limit providers' financial exposure, thereby allowing them to acquire affordable malpractice insurance. *McCarty,* 805 N.E.2d at 899. "The statutory scheme 'attempts to balance the escalating costs of malpractice insurance with the realization that some incidents of malpractice produce devastating results, including astronomical medical bills.' " *Id.* (citation omitted). We reach such an outcome here.

We are not unsympathetic to the difficulties Eric and Dorothy have endured as a result of their son's death. However given our supreme court's language in *Goleski* and the purpose of the Act, Eric and Dorothy's recovery is limited to one $1,250,000 cap because neither Eric nor Dorothy was the actual victim of malpractice.

### Conclusion

There is no evidence that Dorothy suffered physical injuries as a result of the healthcare providers' malpractice. We reverse the trial court's conclusion that Dorothy is entitled to recovery for physical injuries. Neither Eric nor Dorothy was the actual victim of the malpractice, and they may not recover under their own statutory caps. Their total recovery is limited to $1,250,000. We reverse the trial court's order requiring the Fund to pay Eric and Dorothy $3,500,000 and remand to the trial court for a new order consistent with this opinion.

Reversed and remanded.

NAJAM, J., and DARDEN, J., concur.