Steven **SPANGLER** and Heidi Brown, Appellants–Plaintiffs,

v.

Barbara **BECHTEL**, Nurse–Midwife, Expectations Women's Health and Childbearing Center, and St. Vincent Randolph Hospital, Appellees–Defendants.

No. 49A05–0908–CV–482.

Court of Appeals of Indiana.

July 27, 2010.

Lance Wittry, Wittry Law Office, Indianapolis, IN, Attorneys for Appellant.

Edward L. Murphy, Jr., Sarah S. Fanzini, Heidi K. Koeneman, Murphy Law Group, Fort Wayne, IN, Attorneys for Appellees Barbara Bechtel, Nurse-midwife, and Expectations Women's Health and Childbearing Center.

Robert G. Ziegler, Bobby J. Avery–Seagrave, Ziegler Cohen & Koch, Indianapolis, IN, Attorneys for Appellee, St. Vincent Randolph Hospital.

**OPINION**

BROWN, Judge.

Steven Spangler and Heidi Brown (collectively, "Parents") appeal the trial court's grant of motions for summary judgment in favor of St. Vincent Randolph Hospital ("Hospital") and Barbara Bechtel, nurse-midwife, and Expectations Women's Health and Childbearing Center (Bechtel and Expectations collectively, "Midwife"). Parents raise four issues, which we consolidate, revise, and restate as whether the trial court erred in granting Hospital's and Midwife's motions for summary judgment. We reverse.

The relevant facts are not in dispute.[1]

---

1. Despite the undisputed nature of the facts in this case, we remind Parents that their brief should still comply with Ind. Appellate Rule 46(A)(6), which requires that the "facts shall be supported by page references to the Record on Appeal or Appendix in accordance

In 2003, Brown and Spangler,[2] who were not married, were expecting a child. In the afternoon of February 24, 2003, Brown was examined by Midwife, who had provided prenatal care to Brown during her pregnancy. Midwife instructed Brown to go to the Hospital, and later that day, at 5:05 p.m., Brown was admitted to the Hospital in active labor.

After Brown's admission to the Hospital, Midwife continued to manage her labor. At approximately 6:00 p.m., Dr. William Beauchat, an OB/GYN, was notified by telephone of Brown's admission to the Hospital. At 7:35 p.m., Midwife artificially ruptured the "bag of waters." Appellants' Appendix at 231. Soon after, at 7:40 p.m., Dr. Beauchat called the Hospital to check on Brown and her labor progress and was told that Brown "was 8 centimeters, about ready to deliver, [and that] everything is okay." *Id.* at 319. Dr. Beauchat was not told about Midwife's decision to rupture Brown's bag of waters.

Around 8:30 p.m., a prolapsed umbilical cord[3] was identified, and Dr. Beauchat was called to the Hospital in anticipation of having to perform a Cesarean section. At 8:55 p.m., Brown was transferred to a surgery table, but a Cesarean section procedure was not performed and Brown delivered the baby vaginally. At 9:19 p.m., Dr. Beauchat delivered a stillborn infant girl named Skyleigh Donae L. Spangler. There were attempts to resuscitate Skyleigh for twenty-five minutes, but it became evident that the infant died while Brown was in labor and that the fetal heart rate monitor, which had indicated a heart rate, was actually registering Brown's heart rate. An examination of the umbilical cord and placenta revealed "a large thrombus midway in the cord." *Id.* at 270. An autopsy revealed no abnormalities in Skyleigh. Brown was not physically injured during Skyleigh's birth.

On June 23, 2003, Parents filed a complaint against both Hospital[4] and Midwife alleging, as subsequently amended on July 29, 2003, claims of both wrongful death and emotional distress. On May 12, 2005, the Hospital moved for partial summary judgment on the wrongful death claim, and the trial court granted Hospital's motion on September 30, 2005. Parents filed another amended complaint on February 2, 2009 alleging that "[t]he care provided by defendants, and each of them, fell below the standard of care," causing emotional distress.[5] *Id.* at 304. On April 13, 2009, Hospital filed its Renewed Motion for Summary Judgment and brief in support

---

with Rule 22(C)." Ind. Appellate Rule 22(C) provides that "[a]ny factual statement shall be supported by a citation to the page where it appears in an Appendix, and if not contained in an Appendix, to the page it appears in the Transcript or exhibits...."

**2.** Midwife states in her statement of facts that Spangler "was the putative father of the fetus carried by Brown...." Midwife's Brief at 4.

**3.** "A 'prolapsed' umbilical cord means that a portion of the umbilical cord descended into the birth canal along with or preceding the fetal head; in such cases fetal damage or death may result from prolonged pressure on the cord, or when the cord is exposed to air and a thrombus (clot) forms, cutting off the fetal blood supply." Appellants' Appendix at 62.

**4.** Parents also named Dr. Beauchat individually as a defendant. He was dismissed from the action on March 11, 2008.

**5.** The amended complaint also raised claims of failed undertaking and negligent credentialing against Hospital. After Hospital moved for summary judgment, Parents on April 29, 2009 filed two separate responses: one regarding the instant emotional distress claim and one addressing the failed undertaking and negligent credentialing claims. This appeal only concerns the emotional distress claim.

and argued that there were no genuine issues of material fact because: (1) Skyleigh was stillborn and was therefore not a patient under the Medical Malpractice Act (the "Act"); and (2) Parents have no independent cause of action arising from the stillborn infant's death. On April 29, 2009, Parents filed their response to Hospital's motion. On May 8, 2009, Midwife filed her Joint Motion for Summary Judgment and argued that Parents are not entitled to damages because Skyleigh was not born alive and therefore "was not a 'child' for purposes of the Child Wrongful Death Act...." *Id.* at 227. On May 29, 2009, Parents filed their response to Midwife's motion, and Hospital filed its response to Parents' briefs regarding Hospital's summary judgment motion.

On June 2, 2009, the trial court heard oral argument on both summary judgment motions. On July 30, 2009, the trial court granted both motions.

The sole issue is whether the trial court erred in granting both Hospital's and Midwife's motions for summary judgment. Our standard of review for a trial court's grant of a motion for summary judgment is well settled. Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(c); *Mangold ex rel. Mangold v. Ind. Dep't of Natural Res.*, 756 N.E.2d 970, 973 (Ind.2001). All facts and reasonable inferences drawn from those facts are construed in favor of the nonmovant. *Mangold*, 756 N.E.2d at 973.

 Our review of a summary judgment motion is limited to those materials designated to the trial court. *Id.* We must carefully review a decision on summary judgment to ensure that a party was not improperly denied its day in court. *Id.* at 974. Also, where a trial court enters findings of fact and conclusions thereon in granting a motion for summary judgment, as the trial court did in granting Midwife's motion, the entry of specific findings and conclusions does not alter the nature of our review. *Rice v. Strunk*, 670 N.E.2d 1280, 1283 (Ind.1996). In the summary judgment context, we are not bound by the trial court's specific findings of fact and conclusions thereon. *Id.* They merely aid our review by providing us with a statement of reasons for the trial court's actions. *Id.* Where, as here, the material facts are essentially undisputed, our sole task is to determine whether the trial court properly applied the law to the facts. *Laux v. Chopin Land Assocs., Inc.*, 615 N.E.2d 902, 905 (Ind.Ct.App.1993), *reh'g denied, trans. denied.*

## A. Hospital's Summary Judgment Motion

First, we address the trial court's grant of Hospital's summary judgment motion. Parents argue that Hospital misinterprets and misapplies the chief case it relies upon in its brief, *Ind. Patient's Comp. Fund v. Winkle*, 863 N.E.2d 1 (Ind.Ct. App.2007), *reh'g denied, trans. denied,* when Hospital claims that Parents' "unborn child, having died *in utero,* albeit due to Hospital's negligence, is not a 'patient'" under the Act and therefore Parents' position as derivative claimants precludes their cause of action. Appellants' Brief at 7. Hospital argues that the holding in *Winkle* bars "derivative claims arising from [Parents'] stillborn fetus's death because a stillborn fetus is not a *patient* under the Act...." Hospital's Brief at 11. The parties also disagree as to whether Parents have a viable claim for negligent infliction of emotional distress irrespective of the Act.

 Generally, for entities covered under the Act, such as Hospital, medical malpractice claims, including claims for

negligent infliction of emotional distress, must be brought pursuant to its procedures. *Ind. Patient's Comp. Fund v. Patrick*, 929 N.E.2d 190, (Ind.2010); see also *Winkle*, 863 N.E.2d at 7. The Act allows for medical malpractice claims for bodily injury or death of a patient as a result of "a tort or breach of contract based on health care or professional services that were provided, or that should have been provided, by a health care provider, to a patient." Ind.Code § 34–18–2–18; *see* Ind.Code § 34–18–8–1. The Act defines "patient" broadly and includes in its definition any "individual who receives or should have received health care from a health care provider, under a contract, express or implied, and includes a person having a claim of any kind, whether derivative or otherwise, as a result of alleged malpractice on the part of a health care provider." Ind.Code § 34–18–2–22. The Act defines derivative claims as including "the claim of a parent or parents, guardian, trustee, child, relative, attorney, or any other representative of the patient including claims for loss of services, loss of consortium, expenses, and other similar claims." *Id.*

We discuss separately: (1) whether Parents have a claim for negligent infliction of emotional distress; and (2) whether Parents may bring a claim under the Act.

### 1. *Negligent Infliction of Emotional Distress*

The tort for negligent infliction of emotional distress traditionally required that the person claiming emotional injuries may recover damages "only when the distress is accompanied by and results from a physical injury caused by an impact to the person seeking recovery." *Shuamber v. Henderson*, 579 N.E.2d 452, 454 (Ind. 1991). In *Shuamber*, however, the Indiana Supreme Court abrogated the traditional

"impact rule" in favor of the "modified impact rule," explaining:

> When ... a plaintiff sustains a direct impact by the negligence of another and, by virtue of that direct involvement sustains an emotional trauma which is serious in nature and of a kind and extent normally expected to occur in a reasonable person ... a plaintiff is entitled to maintain an action to recover for that emotional trauma without regard to whether the emotional trauma arises out of or accompanies any physical injury to the plaintiff.

*Id.* at 456. The Court subsequently explained that "the modified rule maintains the requirement of a direct impact, but that impact need not result in a physical injury, nor need the emotional trauma result from a physical injury." *Ross v. Cheema*, 716 N.E.2d 435, 436–437 (Ind.1999). The modified impact rule has been reaffirmed numerous times, however, requiring "a plaintiff to demonstrate a direct physical impact resulting from the negligence of another." *Atlantic Coast Airlines v. Cook*, 857 N.E.2d 989, 997 (Ind. 2006).

In *Atlantic Coast Airlines*, the Court examined the question of "whether the degree of impact is sufficient to satisfy the requirement of the rule." *Id.* at 996. The Court noted that:

> [W]hen the courts have been satisfied that the facts of a particular case are such that the alleged mental anguish was not likely speculative, exaggerated, fictitious, or unforeseeable, then the claimant has been allowed to proceed with an emotional distress claim for damages even though the physical impact was slight, or the evidence of physical impact seemed to have been rather tenuous.

*Id.* (citing *Bader v. Johnson*, 732 N.E.2d 1212, 1221 (Ind.2000) (finding that moth-

er's continued pregnancy and the physical transformation that her body underwent satisfied the direct impact requirement) (citing *Alexander v. Scheid*, 726 N.E.2d 272, 283–284 (Ind.2000) (holding that patient suffering from the destruction of healthy lung tissue due to physician's failure to diagnose cancer was sufficient for negligent infliction of emotional distress); *Holloway v. Bob Evans Farms, Inc.*, 695 N.E.2d 991, 996 (Ind.Ct.App.1998) (concluding that restaurant patron's ingestion of a portion of vegetables cooked with a worm was a direct physical impact under the modified impact rule); *Dollar Inn, Inc., v. Slone*, 695 N.E.2d 185, 189 (Ind.Ct. App.1998) (finding that hotel guest mistakenly stabbing herself in the thumb with a hypodermic needle concealed in a roll of toilet paper was sufficient for claim of emotional distress related to guest's fear of contracting AIDS), *reh'g denied, trans. denied* )). After discussing calls to do away with the modified impact rule altogether, however, the Court reaffirmed the rule, concluding that "the requirements under Indiana's rule are modest and that a less restrictive rule would raise the potential for a flood of trivial suits, pose the possibility of fraudulent claims that are difficult for judges and juries to detect, and result in unlimited and unpredictable liability." *Id.* at 997.

The Indiana Supreme Court extended the scope of who may bring a claim for negligent infliction of emotional distress in *Groves v. Taylor*, 729 N.E.2d 569 (Ind. 2000). In *Groves*, the Court noted that "it is undisputed that the plaintiff did not suffer the kind of direct impact required by *Shuamber* to recover as a bystander for emotional distress." *Groves*, 729 N.E.2d at 572. The Court explained that "[t]he value of requiring 'direct impact' is that it provides clear and unambiguous evidence that the plaintiff was so directly involved in the incident giving rise to the emotional trauma that it is unlikely that the claim is merely spurious," but "that there may well be circumstances where, while the plaintiff does not sustain a direct impact, the plaintiff is sufficiently directly involved in the incident giving rise to the emotional trauma that we are able to distinguish legitimate claims from the mere spurious." *Id.* The Court declared, in what is known as the "bystander rule," that:

> [W]here the direct impact test is not met, a bystander may nevertheless establish "direct involvement" by proving that the plaintiff actually witnessed or came on the scene soon after the death or severe injury of a loved one with a relationship to the plaintiff analogous to a spouse, parent, child, grandparent, grandchild, or sibling caused by the defendant's negligent or otherwise tortuous [sic] conduct.

*Id.* at 573.

■ "In sum, in order to recover damages for the negligent infliction [of] emotional distress, a plaintiff must satisfy either the modified impact rule or the bystander rule. The elements for each are separate and distinct."[6] *Atlantic*

---

6. We observe that, following this statement, the Court included the following footnote:

> But see *Keim v. Potter*, 783 N.E.2d 731 (Ind.Ct.App.2003), *trans. not sought* (a medical malpractice action in which patient wrongly diagnosed with hepatitis C was allowed to pursue emotional distress damages on grounds of his "direct involvement" where there was no physical impact);

*Blackwell v. Dykes Funeral Homes. Inc.*, 771 N.E.2d 692 (Ind.Ct.App.2002), [*reh'g denied.*] *trans. denied* (permitting parents to pursue damages for emotional distress for the loss of son's cremated remains although there was no physical impact and the elements for the bystander exception were not met).

*Coast Airlines,* 857 N.E.2d at 998 (footnote omitted).

Here, regarding the direct involvement element, Indiana courts have held on numerous occasions that, when a malpractice claim is brought based upon malpractice affecting a pregnancy, the mother satisfies *Shuamber's* modified impact rule. *See Bader,* 732 N.E.2d at 1222 (holding that mother's "pregnancy and the physical transformation her body underwent as a result, satisfy the direct impact requirement of our modified impact rule" for negligent infliction of emotional distress stemming from child born with severe birth defects); *Ryan v. Brown,* 827 N.E.2d 112, 119, 121 (Ind.Ct.App.2005) (holding that mother suffering miscarriage satisfies modified impact rule because the "emotional damages are directly related to her miscarriage" in which mother "was directly involved"); *Breece v. Lugo,* 800 N.E.2d 224, 225, 229–230 (Ind.Ct.App.2003) (holding that the trial court erred in determining that the parents did not have a claim for negligent infliction of emotional distress stemming from the *in utero* death of a fetus), *reh'g denied, trans. denied.* In fact, Hospital does not cite to a case in which an Indiana court has precluded the parents of a fetus suffering death as the result of medical malpractice from asserting a claim for negligent infliction of emotional distress.

■ Parents' claimed emotional damages, directly related to Brown's stillbirth, are of the kind and extent normally expected to occur in a reasonable person and are not likely speculative, exaggerated, fictitious, or unforeseeable. Accordingly, we conclude that Parents possess a valid claim for negligent infliction of emotional distress based upon Brown's direct involvement in the stillbirth.[7]

### 2. *Parents' Claim Under the Act*

Having determined that Parents possess a valid claim, we next examine whether they may assert their claim under the Medical Malpractice Act. The Act "serves as a procedural mechanism for claims of medical malpractice." *Patrick,* 929 N.E.2d at 193–94. As mentioned above, in order to bring a claim under the Act there must be an injured patient. In cases to date that have allowed for the recovery of emotional damages for negligent infliction of emotional distress stemming from miscarriages or stillbirths, the mother was physically injured as a result of malpractice which the court used to satisfy the requirement. It is important to note, however, that in these cases, although the mother was physically injured, courts have still applied the modified impact rule because the mother's injury itself was not the source of the emotional trauma. Rather, the situation can be more clearly described as a negligently inflicted injury which caused the miscarriage or stillbirth, and it is "by virtue of [mother's] direct involvement" in the miscarriage or stillbirth

---

*Atlantic Coast Airlines,* 857 N.E.2d at 998 n. 8.

7. We note that much of the argument focuses on the emotional injuries that Brown suffered when she suffered a stillbirth. *See, e.g.,* Appellants' Brief at 9 ("In the context of miscarriage, our Court of Appeals has held that a mother's alleged emotional trauma 'is of a kind and extent that one would normally expect in a reasonable woman who has just suffered a miscarriage', [sic] and moreover,

"the damages that a woman who has suffered a miscarriage can pursue are expansive."). Thus, it is unclear at this stage whether Spangler has a valid negligent infliction of emotional distress claim pursuant to *Groves's* bystander rule. Hospital's summary judgment motion does not address Spangler's claim specifically and instead focuses on the procedural issue of whether Skyleigh qualifies as a patient under the Act, discussed in part A.2.

which is the source of the emotional injury. *Shuamber,* 579 N.E.2d at 456.

For example, this court in *Winkle* allowed the Winkles to pursue emotional damages related to the loss of their unborn child, but it required that such damages be recovered pursuant to mother's damage cap. *Winkle,* 863 N.E.2d at 9. The court reasoned that "[n]o one disputes that [mother] is entitled to a cap for the injuries she sustained as a result of the malpractice," specifically hyperemesis gravidarum, a condition that mother's doctors should have treated with vitamin supplements but failed to do so and which caused mother to suffer a degenerative brain disorder in addition to causing the miscarriage. *Id.* at 3, 5. Similarly, in *Ryan v. Brown,* the court based its allowance of mother's negligent infliction of emotional distress claim to proceed because the malpractice "caused [mother's] physical condition to deteriorate to the point that she began to suffer from HELLP Syndrome and had to be transferred to Methodist Hospital for further treatment." 827 N.E.2d at 121.

In *Bolin v. Wingert,* relied upon by both the *Winkle* and *Ryan* courts, the Indiana Supreme Court addressed the issue of whether an eight- to ten-week-old fetus was a "child" under Indiana's Child Wrongful Death Statute ("CWDS") and held that it was not. 764 N.E.2d 201, 203 (Ind.2002). The Court began its analysis by discussing *Britt v. Sears,* 150 Ind.App. 487, 277 N.E.2d 20 (1971), a case addressing a prior version of the CWDS which lacked a specific definition of "child." *Id.* at 205–206. The Britt court "concluded that a 'full term healthy male capable of independent life' was a 'child within the meaning of the statute.'" *Id.* at 206 (quoting *Britt,* 150 Ind.App. at 498, 277 N.E.2d at 27).

In 1987, the legislature revised the CWDS and included a definition of "child" defined as: "'an unmarried individual without dependents who is less than twenty (20) years of age.' Ind.Code Ann. § 34–1–1–8(a) (West 1996). This definition contains four concepts: an (1) unmarried, (2) individual, (3) without dependents, (4) who is less than twenty years of age." *Id.* The Court, in examining the defined "concepts," reasoned that:

The first three concepts tend to indicate the legislature contemplated that only living children would fall within the definition of "child." "Unmarried" and "without dependents" involve activities in which only living persons engage. While very young children cannot marry or have dependents, the vocabulary suggests a desire to define persons who have been born. It would strain this rather express language to read "unmarried individual without dependents" to encompass an unborn child. A foremost precept of statutory interpretation is avoiding illogical and absurd results. *See Mayes v. State,* 744 N.E.2d 390, 393 ( [Ind.] 2001).

The words chosen by the legislature to define "child" have accepted public meanings that point in a similar direction. Black's Law Dictionary defines "individual" as "[e]xisting as an indivisible entity." Black's Law Dictionary 777 (7th ed. 1999). Webster's Dictionary says among other things that an "individual" is a being "referred to by a proper name." Webster's Third New International Dictionary 1152 (1993). This is language human beings use to describe other independently living human beings.

*Id.*

The Court also noted that a "wrongful death action is entirely a creature of statute," and "[b]ecause this statute is in dero-

gation of the common law, we construe it strictly against the expansion of liability." *Id.* at 207. The Court therefore held that "the legislature intended that only children born alive fall under Indiana's Child Wrongful Death Statute." *Id.* However, and as recognized by the court in *Winkle*, *Bolin* also held that "the 'exclusion of unborn children from Indiana's Child Wrongful Death Statute does not mean that negligently injured expectant mothers have no recourse[;]' because plaintiff also sought compensation for *her own pain and suffering*, she could claim damages to compensate her for the miscarriage." *Winkle*, 863 N.E.2d at 9 (quoting *Bolin*, 764 N.E.2d at 207) (emphasis added). Thus, the Court allowed the mother to seek any and all emotional damages, including emotional damages resulting from the loss of her unborn child, as part of her total damage recovery. *Bolin*, 764 N.E.2d at 207–208.

The *Winkle* court applied *Bolin's* reasoning in addressing the question of whether a fetus qualifies as a "patient" under the Act for a claim of negligent infliction of emotional distress. *Winkle*, 863 N.E.2d at 8. The court noted that "[a] 'patient' is defined by the act first and foremost as 'an individual,'" and analogized the definition to the similar language found in the CWDS's definition of "child." *Id.* The *Winkle* court held:

> Applying a similar analysis to the definition of "patient" in the Act as the *Bolin* court did to the definition of "child" in the Child Wrongful Death Statute, and mindful of the *Bolin* decision in general, we conclude that a "patient," defined as it is in the Act as "an individual," must be a living person. Even though the unborn child is often the focus of medical care, that alone does not meet the statutory definition of a "patient." [The parents] are not entitled to additional caps for their negligent infliction of emotional distress claims be-

cause their unborn child is not a "patient" from whom their claims can derive.

*Id.* at 8–9.

However, despite holding that *Bolin* precludes a fetus from "patient" status under the Act, the court still determined that the Winkles could "recover all emotional damages that were suffered as a result of the miscarriage; however, those emotional damages must be recovered under the single statutory cap allotted to [Mother]." *Id.* at 9. Indeed, although *Winkle's* reasoning directly bears on the issue in this case, the specific question addressed in *Winkle* was whether the Winkles were entitled to three separate damage "caps" under the Act due to a single act of medical malpractice. *Id.* at 4. The court discussed *Goleski v. Fritz*, 768 N.E.2d 889 (Ind.2002), which examined the interplay between the patient definition statute, Ind.Code § 34–18–2–22, and Ind. Code § 34–18–14–3(a), the statute capping damages for malpractice claims. *Id.* at 8–9. In *Goleski*, the Indiana Supreme Court, in discussing "derivative claimants" as "patients" under the Act, noted that despite the existence of a "patient" able to assert a claim, "section 34–18–14–3(a) applies the damages cap to all claims, whoever may assert them, for a single 'injury or death of a patient.'" *Goleski.*, 768 N.E.2d at 891 n. 1. The Court then noted that "[t]he only 'injury or death' within the meaning of this section is the injury or death suffered by the *actual victim* of the malpractice." *Id.* (emphasis added).

The *Winkle* court, in applying this language from *Goleski*, held that the mother's *separate* damage award for emotional damages stemming from her miscarriage was derivative in nature because it was the result of an injury inflicted on the unborn child. *Winkle*, 863 N.E.2d at 5. In so hold-

ing, the court recognized that each damage cap must be based upon an injury or death suffered by an "actual victim," and each actual victim is entitled to only one damage cap for an act of malpractice. *Id.* at 10–11; *see also* Ind.Code § 34–18–14–3(a). As discussed above, however, *Bolin* makes clear that "a 'patient,' defined as it is in the Act as 'an individual,' must be a living person," and an unborn child does not meet that statutory definition. *Winkle,* 863 N.E.2d at 8. Thus, the *Winkle* court held that the parents were not "entitled to *additional caps* for their negligent infliction of emotional distress claims because their unborn child [was] not a 'patient' from whom their claims [could] derive." *Id.* at 8–9 (emphasis added). Instead, the court held that the mother's emotional damages must be recovered pursuant to her own damage cap, which also included other injuries mother suffered due to malpractice. *Id.* at 9; *see also id.* at 11 ("[The mother] is entitled to a statutory cap for her injuries. Because the Winkles' unborn child is not a 'patient' pursuant to the Act and because [the mother and father] therefore have no one from whom their negligent infliction of emotional distress claims can derive, they are not entitled to separate statutory caps for their emotional damages.").

■ Here, as articulated by Parents in their brief, there is no damage cap issue; Parents are asking for only a single damage cap award. Because the mother in *Winkle* sustained injuries due to medical malpractice, the court did not address the issue here which is whether, on these facts, Brown qualifies as an "actual victim" of negligence able to assert Parents' claim for negligent infliction of emotional distress. We hold that she does.

In arriving at our conclusion, we find persuasive an argument advanced by Parents that "if an unborn child is not a separate 'person' under our laws, then the unborn child must be a part of mother, both physically and legally...." Appellants' Brief at 8. Indeed, one recent case's observations in examining the *Bolin* rule sheds light on the rule's application in the context of negligent infliction of emotional distress.[8] In *Horn v. Hendrickson,* the expectant mother brought a wrongful death claim for her viable fetus following an automobile accident. 824 N.E.2d 690, 693 (Ind.Ct.App.2005). The *Horn* court, after examining *Bolin* and holding that "the *Bolin* opinion categorically precludes all parents from bringing a wrongful death claim for the death of a viable or nonviable fetus," and therefore that the mother's claim failed, *id.* at 694, noted that "[u]nder *Bolin's* interpretation of the [CWDS], a person whose wrongful act results in the death of a viable fetus owes no civil duty to the parents and is not a tortfeasor, even if that same person is convicted of feticide based on the same facts." *Id.* at 701. The court observed that "[t]he holding in *Bolin* that parents in Indiana cannot recover for the wrongful death of a viable fetus is a return to the 19th century when, in tort law, *a fetus and its mother were considered one and the same." Id.* (emphasis added).

We note that other jurisdictions with similarly-constructed laws have reached this conclusion. In *Modaber v. Kelley,* 232 Va. 60, 348 S.E.2d 233 (1986), the Supreme Court of Virginia examined a similar question. The Court began its analysis by

8. We note that in Pub.L. No. 129–2009, § 8, the legislature amended the CWDS to allow for a cause of action for "a fetus that has attained viability (as defined in IC 16–18–2–

365)." Pub.L. No. 129–2009, § 8 (eff. July 1, 2009) (amending Ind.Code § 34–23–2–1 (Supp.2008)).

noting that "the law is established that an unborn child is not a 'person' within the meaning of [Virginia's] wrongful death statute." *Modaber,* 348 S.E.2d at 236. In concluding that the trial court did not err in instructing a jury that it was permitted to assess damages for injuries and mental anguish suffered by the mother as a result of the death of her fetus, the court adopted the view that "in tort litigation [ ] an unborn child is a part of the mother until birth," and that an "injury to an unborn child constitutes injury to the mother and that she may recover for such physical injury and mental suffering associated with a stillbirth." *Id.* at 236–237. *See also Snow v. Allen,* 227 Ala. 615, 151 So. 468, 471 (1933) (allowing mother's complaint for emotional distress damages stemming from the loss of her unborn child "occasioned by the negligence of defendant" because "[s]o long as the child is within the mother's womb, it is a part of the mother, and for any injury to it, while yet unborn, damages would be recoverable by the mother in a proper case").

■ Also, one recent case, *Ind. Patient's Comp. Fund v. Butcher,* 863 N.E.2d 11 (Ind.Ct.App.2007), highlights a potential absurdity in our case law were we to conclude that Parents could not bring their claim for negligent infliction of emotional distress. The child in *Butcher* was born still just as Skyleigh Spangler was in this case. Efforts to resuscitate the child in *Butcher* succeeded where they failed here, and the child lived on a ventilator for a few days before succumbing to the injuries inflicted by medical malpractice. Because the child did live for those few days, however, it was not at issue whether the child was a patient under the Act, and therefore the parents in *Butcher* had a valid negligent infliction of emotional distress claim stemming from his death.[9] *Butcher,* 863 N.E.2d at 16. Here, however, because Skyleigh was not able to be resuscitated, her eligibility to qualify as a patient under the Act has been our central inquiry. We do not believe that the legislature intended such sweeping legal implications as to preclude medical malpractice liability on the one hand and allow it on the other based upon whether a full-term, viable fetus actually survives the pregnancy, even if for a day or two only. We therefore hold that a mother who suffers a stillbirth due to medical malpractice qualifies as an injured patient and satisfies the actual victim requirement under the Medical Malpractice Act regardless of whether the malpractice resulted in injuries to the mother, the fetus, or both, and Parents may assert a claim for negligent infliction of emotional distress under *Shuamber's* modified impact rule.[10] Accordingly, we conclude that the trial court erred when it granted Hospital's motion for summary judgment.

### B. *Midwife's Summary Judgment Motion*

We next address the trial court's grant of Midwife's summary judgment motion. As noted by Parents, the trial court accepted Midwife's arguments in granting Midwife's summary judgment motion. In its order granting Midwife's motion for

---

9. Indeed, the Fund conceded the point. *Butcher,* 863 N.E.2d at 16.

10. As noted in footnote 6, it is unclear whether Spangler has a valid claim for negligent infliction of emotional distress. We note, however, that even if Spangler does have a valid claim under the bystander rule, both Spangler's claim and Brown's claim together are entitled to a single damage cap because there was only one "actual victim" of malpractice from which the negligent infliction of emotional distress claims derive. *See Goleski,* 768 N.E.2d at 891 n. 1.

summary judgment, the trial court made the following conclusions of law: [11]

15. [Parents] cannot identify the negligently-inflicted injuries necessary to prove their negligent infliction of emotional distress claim. No claim is pending before the Court on which it could find the stillbirth of the infant was negligently-inflicted by the acts or omissions of [Midwife]. [Parents] have no claim against [Midwife] arising from the stillbirth of the infant female under either the [Act] or the [CWDS]. No claim for wrongful death exists at common law that [Parents] could allege against [Midwife]. Furthermore, Brown does not allege any personal injuries, including any lost wages or reasonable medical expenses, arising from any act or omission by [Midwife] during the course of her labor that might support an allegation of negligence. Under Indiana law regarding negligent infliction of emotional distress, Plaintiffs cannot prove their alleged emotional distress was caused by "negligently-inflicted" injuries on another. Consequently, [Parents'] claim for negligent infliction of emotional distress fails as a matter of law.

\* \* \* \* \* \*

20. . . . . Even assuming [Parents] can establish the negligently-inflicted injury central to the claim and the serious emotion trauma, *Groves* requires direct impact or direct involvement. [*Groves,* 729 N.E.2d at 573]. "Direct involvement" re-

quires that the claimant witness the death or severe injury of a relation analogous to a "spouse parent, *child,* grandparent, grandchild, or sibling" arising from the negligence of a tortfeasor. *[Ind. Patient's Comp. Fund v. ]Patrick,* [906 N.E.2d 194, 199 (Ind.Ct.App.2009), *vacated.*] (quoting *Groves,* 729 N.E.2d at 573) (emphasis added). A stillborn infant female is not a "child" for the purposes of the [CWDS], and should not be considered one in this context.

21. Finally, in *Patrick,* the negligent infliction of emotional distress claim arises in the context of an underlying tort. *Patrick* arises from a claim for medical malpractice, where the father's witness of the consequence of the medical malpractice involving his son provides the basis for his negligent infliction of emotional distress claim. Here, despite the unfortunate death, there is no underlying tort as it relates to [Midwife]. As held above, [Midwife cannot] be held liable under the [CWDS] for the stillbirth of the infant female because she was not a "child" for purposes of the [CWDS]. *Bolin,* 764 N.E.2d at 20.[sic]

22. The use of the term "independent" in *Patrick* only signifies that the father's negligent infliction of emotional distress claim exists in addition to the father's claim on his son's behalf under the [Act] and [Adult Wrongful Death Statute]. *Patrick* cannot be read to abrogate

---

11. We note that the trial court's order examined and applied *Ind. Patient's Comp. Fund v. Patrick,* 906 N.E.2d 194 (Ind.Ct.App.2009), *vacated by Patrick,* 919 N.E.2d 552. This court's opinion in *Patrick* was handed down on May 18, 2009, only days before the summary judgment hearing in this case where it was discussed and interpreted. It was also briefed at length by the parties.

Indiana law regarding the negligent infliction of emotional distress generally, which requires a negligently-inflicted injury at its core. [Parents'] argued application of *Patrick* attempts to avoid this essential element and, further, bypass clear Indiana precedent barring any claim under the [CWDS] for the stillbirth of an infant.

Appellants' Appendix at 21–24.

As Parents articulate, "[d]ue to Midwife's election of non-coverage under the Medical Malpractice Act, that Act is inapplicable to the claims against Midwife." Appellants' Brief at 23. Parents argue that this court has held numerous times that negligent infliction of emotional distress is an independent tort and "not contingent upon proof of a separate, underlying tort." *Id.* (quoting *Butcher*, 863 N.E.2d at 17). Parents therefore argue that "[t]o the extent that summary judgment was granted on the premise that a separate tort must be established under the [CWDS], that premise is inconsistent with established precedent, and is in error." *Id.* at 23–24.

Midwife argues that "[i]t is undisputed that there is no cause of action at Indiana common law for the wrongful death of a child.... Indiana has thus adopted a child wrongful death statute...." Midwife's Brief at 9 (citing *Bolin*, 764 N.E.2d at 203, 207). Midwife, relying on the trial court's order, argues that because Midwife is not a qualified healthcare provider for the purposes of the Act, "any claim Parents may have in conjunction with the stillbirth is subject to the [CWDS]."[12] *Id.* at 6. Mid-

wife repeatedly and without citation to authority argues in her brief that Parents' claim must fail because the CWDS does not recognize an action for the wrongful death of a fetus, and that the CWDS was Parents' sole remedy that they could seek on these facts. *See id.* at 8 ("However, because their claim of emotional distress arises from the death of their fetus, their claim cannot exist independently. It must be interpreted, analyzed and pursued pursuant to the [CWDS]."); *id.* ("Parents' attempt to reframe their claim as one outside the [CWDS] is without merit. Parents cannot avoid the dispositive implications of the [CWDS] merely by couching their complaint as one for the common law independent tort of emotional distress."); *id.* at 11 ("Indiana law is clear. The *in utero* death of a fetus, regardless of gestational age, is not compensable under the [CWDS], which controls the analysis in this case. As a result, Parents' claim for damages resulting from the *in utero* death of their daughter cannot stand.").

■■ Our discussion of the tort of negligent infliction of emotional distress in part A. 1 applies with equal force to Midwife. As the Indiana Supreme Court's recent opinion in *Patrick* articulates, the Act "is procedural and [does] not enlarge the scope of damages that can be sought against healthcare providers." *Patrick*, 929 N.E.2d at 193; *see also Breece*, 800 N.E.2d at 227 (noting that the purpose of the Act is "to protect health care providers from malpractice claims, not to create new and additional causes of action") (citation omitted). Thus, claims which are allowable under the Act may be brought against

12. Midwife rephrases her argument as:

Despite Parents' creative pleading and their understandable frustration at having no cause of action for the death of their fetus, the Parents' claim arises out of the death of their stillborn child and as a result, is properly framed as a wrongful death action. There is simply no claim of emotional distress without the fetus' death. Actions arising as a result of the child's death are governed exclusively by the [CWDS].
Midwife's Brief at 6.

parties not under the Act's protection because the Act merely dictates procedures by which a claimant may bring a cause of action. Midwife, on the other hand, does not enjoy the protection provided by the Act. Also, to the extent that Midwife argues that a claim for negligent infliction of emotional distress is reliant on the CWDS, *Patrick* makes clear that causes of action for emotional damages as the result of a miscarriage or stillbirth are not only allowable claims, but also are not reliant on the CWDS. *Patrick*, 929 N.E.2d at 194 (citing *Ryan*, 827 N.E.2d 112, 121 (holding that "mothers who have suffered a miscarriage may pursue a claim for all intangible damages directly related to their miscarriage"); *and Breece*, 800 N.E.2d 224, 230 (holding that, although the parents did not have a viable cause of action under the CWDS, they may maintain an action for emotional damages stemming from their miscarriage)). In each of those cases, the court recognized the plaintiff's ability to bring an emotional distress claim without relying on the CWDS. We therefore hold that Brown's direct involvement in the stillbirth allows Parents to proceed on their negligent infliction of emotional distress claim against Midwife, and we conclude that the trial court erred in granting Midwife's motion for summary judgment.[13]

For the foregoing reasons, we reverse the trial court's orders granting summary judgment motions in favor of St. Vincent Randolph Hospital and Barbara Bechtel, nurse-midwife, and Expectations Women's Health and Childbearing Center, and remand for further proceedings.

Reversed.

MATHIAS, J., and BARNES, J., concur.

---

**13.** We observe that Midwife argues in passing that "there is no evidence in the record of any wrongdoing or negligence by [Midwife]. The Medical Review Panel ... did not address the care and treatment of [Midwife].... [T]here is no evidence in the record of any adverse medical testimony with respect to the care and treatment provided by [Midwife]." Midwife's Brief at 14–15. However, as noted in Parents' reply brief, "Midwife's trial court motion for summary judgment was not based upon such contention...." Appellants' Reply Brief at 4 n. 1. Having reviewed Midwife's summary judgment motion, we agree with Parents that Midwife's motion for summary judgment was based solely on the theory that "[b]y virtue of its stillbirth, the Fetus was not a "child" [sic] for purposes of the Child Wrongful Death Act, which controls this action...." Appellants' Appendix at 227. Thus, Midwife's argument fails. *See Wagner v. Yates*, 912 N.E.2d 805, 811 n. 1 (Ind.2009) (noting that "substantive questions independent in character and not within the issues or not presented to the trial court shall not be first made on appeal").