Sally McCARTY, Commissioner of the Indiana Department of Insurance, as Administrator of the Indiana Patient's Compensation Fund, Appellant–Defendant,

v.

Vicki L. SANDERS and Daniel P. Sanders, Individually and as Natural Parents of Lucas Sanders, Deceased Infant; Michael T. Thomas, Administrator of the Estate of Kerry L. Thomas, Deceased, and Individually, and Jacob M. Thomas, Deceased, and Individually, and Jacob M. Thomas, by next friend, Michael T. Thomas; and Jeffrey Koehl and Carla S. Koehl, as Parents, Natural Guardians, and Legally Appointed Co–Guardians of the Estates of Mariah K. Koehl and Samantha K. Koehl, Minors, Appellees–Plaintiffs.

No. 49A02–0304–CV–324.

Court of Appeals of Indiana.

April 7, 2004.

---

Robert G. Weddle, Matthew W. Conner, Indianapolis, IN, Attorneys for Appellant.

Timothy J. Kennedy, Indianapolis, IN, Jon M. Pinnick, Donald B. Kite, Sr., Carmel, IN, Mark A. McCann, Mark A. Scott, Kokomo, IN, Steven L. Langer, Jennifer E. Davis, Valparaiso, IN, Marshall S. Hanley, Indianapolis, IN, Attorneys for Appellees.

## OPINION

RATLIFF, Senior Judge.

### STATEMENT OF THE CASE

Appellant–Defendant Sally McCarty, Commissioner of the Indiana Department of Insurance (the "Commissioner"), as administrator of the Indiana Patient's Compensation Fund (the "Fund") appeals the trial court's denial of the Fund's motion for partial summary judgment in actions involving Appellees–Plaintiffs Vicki L. Sanders and Daniel P. Sanders (the "Sanders"), individually and as natural parents of Lucas Sanders, deceased infant; and Michael T. Thomas ("Thomas"), administrator of the Estate of Kerry L. Thomas, deceased, and individually, and Jacob M. Thomas, by next friend, Michael T. Thomas. The Commissioner also appeals the trial court's grant of partial summary judgment in an action involving Jeffrey Koehl and Carla S. Koehl (the "Koehls"), as parents, natural guardians, and legally appointed co-guardians of the estates of Mariah K. Koehl and Samantha K. Koehl, minors.

We affirm.

## ISSUES

I. Whether the trial court erred in determining as a matter of law that the Sanders and the Koehls may recover from the Fund for multiple injuries under separate statutory caps after a single statutory minimum payment has been made by the health care provider.

II. Whether the trial court erred in basing its denial of the Commissioner's motion for partial summary judgment on its conclusion that that there was only one occurrence of malpractice by the health care provider in Thomas' case.

III. Whether the language of Thomas' settlement agreement precludes Jacob Thomas from recovering from the Fund.

## STATEMENT OF THE FACTS

Due to the similarity in the facts therein, the trial court consolidated three separate cases. In each case, it was alleged that a single occurrence of malpractice resulted in injuries to more than one victim. The health care providers in each case paid the equivalent of the maximum amount under the Medical Malpractice Act ("the Act") of $100,000.00 for the single occurrence of malpractice. Under the provisions of the Act, claims were then made against the Fund for the payment of damages that exceeded the $100,000.00 statutory cap amount paid by the health care providers. In the petitions for recovery from the fund, each injured party made a separate claim under a separate statutory cap.

### A. The Sanders

In January of 1997, Stanley R. Drake, M.D. ("Drake") delayed delivery of twins carried by Vicki Sanders. After Vicki experienced severe hemorrhaging, one child ("Lucas") died, and the other child ("Katie") experienced damage to her brain. Vicki suffered various injuries.

The Sanders filed with the Department of Insurance an amended proposed complaint against Drake and Terre Haute Regional Hospital ("THR"). In their amended complaint, the Sanders alleged that Drake and THR were negligent during the treatment and hospitalization of Vicki for labor and delivery of Lucas and Katie on January 9, 1997.

In March of 2000, the Sanders entered into a release, settlement agreement, and confidentiality agreement with Health Care Indemnity, Inc. ("HCI"), THR's insurer. Pursuant to the release, HCI agreed to pay the equivalent of the statutory health care provider cap of $100,000.00. In exchange for the settlement payments, the Sanders released THR and HCI from any and all claims connected with the admission and treatment of Vicki Sanders and the delivery of Lucas and Katie.

The Sanders filed their petition for excess damages from the Fund under Ind. Code § 34–18–15–3. In their petition, the Sanders alleged that their agreement to settle with the health care provider for the statutory equivalent of $100,000.00 under Ind.Code § 34–18–14–4(b) entitles each of them to recover from the Fund. The Sanders petitioned on the understanding that they were entitled to damages from the Fund under a separate $750,000.00 statutory limit for each of them.

### B. The Koehls

In April and May of 1997, Jerry L. Kight, M.D. ("Kight") administered radioactive iodine as thyroid treatments to Carla Koehl while she was pregnant with her twins, Mariah and Samantha. The administration of this substance resulted in injuries to Mariah and Samantha, who now suffer from hypothyroidism.

In October of 2000, the Koehls entered into a settlement agreement with Kight. Pursuant to the agreement, Kight agreed to pay the statutory sum of $100,000.00 in exchange for a complete release of liability for all claims relating to his care and treatment of Carla, Mariah, and Samantha.

In January of 2000, the Koehls filed two separate petitions against the Fund, one on behalf of Mariah and the other on of behalf of Samantha. Mariah and Samantha alleged that Kight's payment entitles them to recover damages from the Fund for their separate injuries.

### C. Thomas

On September 24, 1998, Kerry Thomas was admitted to Caylor–Nickel Medical Center ("Caylor–Nickel") for delivery of her child, Jacob. A nurse anesthetist employed by Caylor–Nickel administered an epidural injection to Kerry. Within a few minutes after the epidural began, Kerry became non-responsive, her respiration ceased, and she went into cardiopulmonary arrest. Resuscitative measures were taken, and Kerry was taken to an operating room where Jacob was delivered by caesarian section.

Kerry did not regain consciousness, and she died on October 23, 1998. As a result of Kerry's cardiopulmonary arrest during childbirth, Jacob suffered anoxic encephalopathy, which resulted in permanent brain damage.

On December 11, 1998, Michael Thomas, individually, as Jacob's next friend, and in his capacity as administrator of Kerry's estate, filed a medical malpractice proposed complaint against Caylor–Nickel. Thomas subsequently accepted a settlement payment of $100,000.00 from Caylor–Nickel and its insurer, Medical Assurance of Indiana. Thomas then entered into an agreed entry of judgment with the Commissioner whereby the Fund paid Thomas $650,000.00 as a settlement to Kerry's estate.

On August 9, 2002, the Thomases filed an amended petition for payment of damages from the Fund, alleging that Jacob is entitled to recovery under a separate cap.

### D. Consolidation

The trial court consolidated the three cases described above for purposes of ruling on pending motions for partial summary judgment filed by the Commissioner in the Sanders' and Thomas' cases and a pending motion for summary judgment filed by the Koehls. The Commissioner contended that settlement payments of the statutory cap amount of $100,000.00 must be made by the health care providers to each injured party before the injured parties are entitled to excess damages from the Fund.

The trial court denied the Commissioner's request for partial summary judgment and granted the Koehls' request, stating that a single $100,000.00 payment from the health care provider in each case allowed each injured party to seek excess damages from the Fund. The trial court further stated that the Act allows each injured party to recover damages under a separate $750,000.00 cap. The Fund now appeals.

## DISCUSSION AND DECISION

### STANDARD OF REVIEW

The purpose of summary judgment is to end litigation when no issue of material fact exists and when the case may be determined as a matter of law. *LeBrun v. Conner*, 702 N.E.2d 754, 756 (Ind.Ct.App. 1998). We must exercise caution to ensure a party of its right to a fair determination of genuine issues. *Art Country Squire, L.L.C. v. Inland Mortgage Corp.*, 745 N.E.2d 885, 891 (Ind.App.2001). The burden is on the movant to negate the existence of any genuine issue of material fact,

and all doubts must be resolved against the movant. *Id.* It is only after the movant makes a prima facie showing of the nonexistence of a genuine issue of material fact that the burden shifts to the nonmovant to set forth specific facts showing the existence of a genuine issue for trial. *Id.* In reviewing the nonmovant's response, we consider as true the facts set forth in the nonmovant's affidavits and liberally construe discovery in the nonmovant's favor. *Id.* Where the material facts are undisputed, the sole task of the court on appeal is to determine whether the trial court properly applied the law to the facts. *Laux v. Chopin Land Associates, Inc.,* 615 N.E.2d 902, 905 (Ind.Ct.App.1993), *trans. denied.* The interpretation of a statute is a pure question of law for the court. *Chavis v. Patton,* 683 N.E.2d 253, 257 (Ind.Ct.App. 1997).

## I.  THE SANDERS AND THE KOEHLS

■ Ind.Code § 34–18–14–3(a) provides that the total amount recoverable for "an injury or death of a patient" may not exceed $750,000.00 for an act of malpractice that occurred during the time period at issue.[1] During the time period at issue, Ind.Code § 34–18–14–3(b) provided that a qualified health care provider was not liable for an amount in excess of $100,000.00 for an "occurrence of malpractice."[2] Ind. Code § 34–18–14–3(c) provides that any amount due that is in excess of the total liability of all liable health care providers shall be paid from the Fund.

The Commissioner contends that the trial court erred in interpreting Ind.Code § 34–18–14–3 to allow each injured person to recover under separate statutory caps from the Fund. The Commissioner argues that the trial court failed to properly apply certain rules of construction in interpreting the statute. The Commissioner further argues that the trial court's interpretation of the statute conflicts with prior case law. The Commissioner asserts that the terms "injury or death" used in Ind. Code § 34–18–14–3(a) are synonymous with the terms "occurrence of malpractice" used in Ind.Code § 34–18–14–3(b).

The first step in statutory interpretation is to determine whether the legislature has spoken clearly and unambiguously on the point in question. *Parkhurst v. Van Winkle,* 786 N.E.2d 1159, 1160 (Ind.Ct. App.2003). When a statute is clear and unambiguous, courts need not, and indeed shall not, apply any rules of construction other than to require that words and phrases be taken in their plain, ordinary, and usual sense. *Id.* (quoting *Coutee v. Lafayette Neighborhood Housing Services, Inc.,* 792 N.E.2d 907, 912 (Ind.Ct.App. 2003), *trans. denied* ). Questions of statutory interpretation are particularly amenable to resolution by summary judgment. *Chief Industries, Inc. v. Indiana Department of Revenue,* 792 N.E.2d 972, 976 (Ind. Tax Ct.2000).

In the present case, the trial court determined that Ind.Code § 34–18–14–3 is unambiguous. We agree. Subsection (a) limits recovery for an "injury or death of a patient" to $750,000.00. The term "patient" is defined in Ind.Code § 34–18–2–22 as "an individual who receives or should have received health care from a health care provider, under a contract, express or implied, and includes a person having a

---

1.  Ind.Code § 34–18–14–3(a) also provides a cap of $500,000.00 for injury or death from an act of malpractice that occurred before January 1, 1990 and a cap of $1,250,00.00 for injury or death from an act of malpractice that occurred after June 30, 1999. These caps are not applicable to this case.

2.  The statutory limit is now $250,000.00.

claim of any kind, whether derivative or otherwise, as a result of alleged malpractice on the part of a health care provider." All the claimants in this case are "patients" under Ind.Code § 34–18–2–22, a conclusion that the Commissioner does not dispute.

Subsection (b) limits the amount that a health care provider has to pay for an "occurrence of malpractice." The plain meaning of "occurrence," a term not defined by the Act, is "act or instance of occurring," "happening," "event," "episode," or "incident." *The American Heritage College Dictionary* at 944 (3d ed.1993). An occurrence of malpractice is the actual act itself, not the resulting injury. The legislature could have chosen to require a health care provider to pay up to $100,000.00 for each "injury or death of a patient" resulting from an occurrence of malpractice, but it clearly did not do so.

In *Johnson v. St. Vincent Hospital, Inc.*, 273 Ind. 374, 404 N.E.2d 585, 589–90 (1980), *abrogated on other grounds by Collins v. Day*, 644 N.E.2d 72 (Ind.1994), our supreme court stated the conditions which led to the passage of the Act:

Immediately prior to its enactment seven of the ten insurance companies writing the majority of medical malpractice insurance policies in the State ceased or limited writing such insurance because of unprofitability or an inability to calculate an adequate premium. Premiums had already increased as much as 1200 percent over a period of fifteen years because of the increase in the number and size of claims. Physicians practicing high risk specialties such as anesthesiology were hard pressed or totally unable to purchase insurance coverage. In some rural areas surgery was reported cancelled. Emergency services were discontinued at some hospitals. Health care providers had become fearful of the exposure to malpractice claims and at the same time were unable to obtain adequate malpractice insurance coverage at reasonable prices.

Thus, the primary purpose of the Act was to limit the financial exposure of healthcare providers, thereby allowing them to acquire affordable malpractice insurance. To effectuate this purpose, the Act apportions financial responsibility between health care providers and the Fund. *Eakin v. Reed*, 567 N.E.2d 148, 149–50 (Ind.Ct. App.1991), *trans. denied*. The statutory scheme "attempts to balance the escalating costs of malpractice insurance with the realization that some incidents of malpractice produce devastating results, including astronomical medical bills." *Id.*

The plain, unambiguous language of Ind. Code § 34–18–14–3 is consistent with the purposes of the Act. Ind.Code § 34–18–14–3(a) allows each injured person to obtain excess damages to cover the costs of his or her injury. On the other hand, Ind.Code § 34–18–14–3(b) limits the amount of damages that a health care provider may have to pay because of a single occurrence to the set amount of $100,000.00. Thus, Subsection (b) does not compel malpractice carriers to factor in additional, unpredictable costs that would be incurred if the statutory cap were tied to the possible multiple injuries resulting from an occurrence of malpractice. Accordingly, as interpreted by the trial court upon its plain meaning, the statute achieves the twin goals of compensating those injured by malpractice and at the same time assuring that malpractice insurance will be available to health care providers.

Furthermore, we do not find *St. Anthony Medical Center, Inc. v. Smith*, 592 N.E.2d 732 (Ind.Ct.App.1992) or *Bova v. Roig*, 604 N.E.2d 1 (Ind.Ct.App.1992) to be controlling. The facts of these cases, which pertained to the rare instance where

two occurrences of malpractice resulted in a single injury, are significantly different from the facts in the present case. With regard to any language in *St. Anthony* that appears to conflict with our holding here, we note that under the facts of *St. Anthony* the "occurrences" and the "injury" were, as a practical matter, the same. Here, there is more than one injury.

The trial court did not err in denying the Commissioner's motion for partial summary judgment as it pertains to the Sanders and Thomas or in granting the Koehls' motion for summary judgment.

## II. FACTUAL QUESTION PERTAINING TO JACOB THOMAS' CLAIM

■ One of the reasons given by the trial court for the denial of the Commissioner's motion for partial summary judgment was that "[t]he Act allows only one Provider limit in each case here because there is only one act of malpractice in each case. Holding otherwise contravenes the clear meaning of 'occurrence' and the consistent logic of Indiana cases interpreting the Act." Appellant's App. at 43. In its subsequent supplemental order, the trial court noted that Caylor–Nickel's insurer, Medical Assurance, had filed a motion for summary judgment "seeking a determination that there is one 'occurrence' of malpractice, therefore one liability limit for its physician under the [Act]." Appellant's App. at 45. In granting Medical Assurance's motion, the trial court concluded that it had previously concluded that "there is one 'occurrence' in the consolidated cases, including [Thomas]." *Id.* The practical effect of the trial court's orders is a grant of summary judgment in favor of Thomas on the issue of whether there was only one occurrence of malpractice.

The Commissioner contends that there is a material issue of fact which precludes the trial court from granting summary judgment to Thomas on the question of whether the tragic circumstances that resulted in Kerry's death and Jacob's injuries constitute a single occurrence of malpractice under the Act. The Commissioner points to designated evidence, in the form of designated portions of a deposition by its expert, Edwin Campbell, M.D. ("Campbell"). In response, Thomas points to designated portions of the same deposition.

Campbell stated in his deposition that a nurse anesthesiologist administered an epidural to Kerry, and that even though Kerry expressed discomfort, the nurse proceeded to inject the epidural in the wrong location. Kerry went into pulmonary arrest and Jacob's brain began to be deprived of oxygen. The room did not have the proper equipment to aid in Kerry's resuscitation, so the nurse anesthesiologist sent Jerry Thomas to find another nurse to secure the equipment. By the time the obstetrician arrived, Kerry was intubated. The obstetrician then realized that a caesarian section was needed. However, the obstetrician took an "inordinate amount of time" in performing the procedure.

Campbell further stated that Jacob was deprived of oxygen from the onset of his mother's cardio-pulmonary arrest and continued to be in distress until his delivery. Campbell also stated that it is difficult to quantify the amount of brain damage experienced by Jacob at any certain point, but he opined that the damage increases "with every minute that goes by without oxygen." Campbell concluded that even though the hospital's delay in performing the caesarian was a separate act, both Kerry's and Jacob's injuries were caused by the nurse anesthetist's negligence.

Our review of Campbell's deposition leads us to the conclusion that there was one continuous sequence of events that led to two separate injuries. This continuous

sequence, beginning with the misplaced epidural and concluding with the delinquent caesarian section, was precipitated by Caylor–Nickel's failure to provide necessary personnel to cover the contingencies occasioned by the negligent administration of the epidural to Kerry. The trial court was correct in determining that there was no material issue of fact in this matter.

### III. THE SETTLEMENT AGREEMENT

 The Commissioner contends that because Jacob was not made a party to the settlement agreement between Kerry and Caylor–Nickel, he had no standing to demand payment from the Fund. In support of her contention, the Commissioner cites Ind.Code § 34–18–15–3, which delineates the procedure for demanding payment from the Fund. Included in the statute is the requirement that claimants file a petition demanding payment of damages from the Fund after a health care provider or its insurer has agreed to settle its liability on a claim. Ind.Code § 34–18–15–3(1)(B). The crux of the Commissioner's contention is that Jacob was not the "claimant" who settled with Caylor–Nickel, and he thus cannot be the "claimant" who makes a demand of payment from the Fund.

Because there was one occurrence of malpractice that resulted in two injuries, Caylor–Nickel was required to settle its liability by making a single payment of its policy limits. Caylor–Nickel, through its insurer, has agreed to settle its liability to Kerry on the occurrence of malpractice that resulted in injuries to both Kerry and Jacob. When that settlement of liability was made, the injured parties then became eligible to make a demand for damages from the Fund. We do not believe that the statute should be read to require that Jacob do the useless act of making a

claim to Caylor–Nickel when it has already agreed to settle its liability. *See Apple v. Apple,* 157 Ind.App. 68, 299 N.E.2d 239, 242 (1973) (holding that equity does not require the doing of a useless thing). Jacob's filing of a petition demanding payment of damages from the Fund is sufficient to establish his standing as a "claimant" under the statute.

### *CONCLUSION*

The trial court did not err in denying the Commissioner's motion for partial summary judgment as it pertained to the Sanders and Thomas. Furthermore, the trial court did not err in granting the Koehls' motion for partial summary judgment.

Affirmed.

RILEY, J., and SHARPNACK, J., concur.