

I N T H E

# Court of Appeals of Indiana

Brittney Keisler, Individually and as Natural Parent and Next Friend of Lilee Keisler, Deceased,

*Appellants-Petitioners*



FILED

May 18 2026, 8:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

v.

Indiana Department of Insurance Patient's Compensation Fund c/o Holly W. Lambert, Commissioner,

*Appellee-Respondent*

May 18, 2026

Court of Appeals Case No.
25A-CT-2034

Appeal from the Marion Superior Court

The Honorable Timothy W. Oakes, Judge

Trial Court Cause No.
49D02-2501-PL-004309

**Opinion by Judge Felix**

Judge Mathias concurs.
Judge May dissents with a separate opinion.

**Felix, Judge.**

## Statement of the Case

Brittney Keisler's newborn Lilee Keisler-Rushton died after health care providers failed to timely notify Keisler that Lilee had a genetic condition that could be fatal if left untreated. After settling with the health care providers for the maximum amount allowed under the Indiana Medical Malpractice Act (the "MMA"), Keisler petitioned for excess damages from the Indiana Department of Insurance Patient's Compensation Fund (the "Fund") for Lilee's death and Keisler's emotional distress. The Fund settled Keisler's claim concerning Lilee's death. Keisler filed a motion for summary judgment on her emotional distress claim, arguing she was entitled to additional damages thereon because it was separate and distinct from her wrongful death claim. The trial court disagreed and denied the motion. Keisler now appeals and raises one issue for our review: Whether the trial court erred by denying Keisler's summary judgment motion.

We affirm.

## Facts and Procedural History

On October 29, 2018, Keisler gave birth to Lilee at Hendricks Regional Health. On October 31, Lilee was discharged from Hendricks Regional Health, and her newborn screening results were still pending. On November 3, Doctor Donald McIntire, Lilee's pediatrician, was notified of Lilee's screening results, which were positive for galactosemia.[1] That same day, Dr. McIntire attempted to notify Keisler of the results but was unsuccessful. It was not until November 5, when Keisler brought Lilee to her previously scheduled appointment with Dr. McIntire, that he informed Keisler of the results. By that time, Lilee was already critically ill, so Dr. McIntire arranged for Lilee to be admitted to Peyton Manning Children's Hospital at Ascension St. Vincent. At Dr. McIntire's direction, Keisler drove Lilee to Peyton Manning Children's Hospital. The next day, November 6, Lilee died from metabolic acidosis, severe sepsis, and multi-system organ failure.

After going through the Medical Review Panel process, Keisler sued the health care providers for Lilee's death and Keisler's emotional distress. In early 2025, Keisler and the providers settled her claims in that case for $400,000—the

---

[1] Galactosemia is an inherited metabolic disorder that prevents a person from processing a sugar called galactose, which is present in both breast milk and most baby formulas. *Galactosemia*, CLEVELAND CLINIC (Aug. 25, 2022), https://my.clevelandclinic.org/health/diseases/24062-galactosemia; *Galactosemia*, MEDLINEPLUS, https://medlineplus.gov/genetics/condition/galactosemia/ (last visited Feb. 25, 2026). If left untreated, galactosemia can cause an array of complications, including lethargy, jaundice, failure to thrive, sepsis, and death. *Galactosemia*, BOSTON CHILDREN'S HOSPITAL, https://www.childrenshospital.org/conditions-treatments/galactosemia (last visited Feb. 25, 2026).

providers' maximum liability for damages under the MMA. *See* Ind. Code § 34-18-14-3-(b)(2).

[5] On January 27, Keisler petitioned for excess compensation from the Fund. Keisler sought $1,250,000 for Lilee's death (the "Wrongful Death Claim") pursuant to the MMA and the Child Wrongful Death Statute[2]. Keisler also sought $1,650,000 for the emotional distress she suffered "as a result of the underlying medical malpractice" (the "Emotional Distress Claim"). Appellants' App. Vol. II at 25. The Fund objected to paying the amounts Keisler demanded in her petition.

[6] Thereafter, Keisler and the Fund settled Keisler's claim pertaining to Lilee's death for $1,250,000—the Fund's maximum liability for damages under the MMA given the providers' $400,000 settlement, I.C. § 34-18-14-3(a)(4). Keisler also filed a motion for partial summary judgment (the "Motion") "on the issue of the statutory liability limits available" under the MMA. Appellants' App. Vol. II at 50. Keisler argued that she is entitled to recover under two statutory caps—one for the Emotional Distress Claim and one for the Wrongful Death Claim. After a hearing, the trial court denied the Motion. Upon Keisler's request, the trial court entered final judgment as to its denial of the Motion. This appeal ensued.[3]

---

[2] Ind. Code § 34-23-2-1.

[3] Keisler put all her record citations in footnotes. This court "discourages parties from engaging in such a footnote-citation practice because [it] disrupts the reader from the body of the text, to the bottom of the page,

## Discussion and Decision

### The Trial Court Did Not Err by Denying the Motion

[7] Keisler argues the trial court erred by denying the Motion. We review summary judgment decisions de novo, *Gierek v. Anonymous 1*, 250 N.E.3d 378, 384 (Ind. 2025) (citing *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014)), which means we apply the same standard as the trial court, *Wohlt v. Wohlt*, 245 N.E.3d 611, 615 (Ind. 2024) (citing *Red Lobster Rests. LLC v. Fricke*, 234 N.E.3d 159, 165 (Ind. 2024)). Summary judgment is proper only "if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Abbott v. State*, 183 N.E.3d 1074, 1079 (Ind. 2022) (quoting *Hughley*, 15 N.E.3d at 1003).

[8] "The party moving for summary judgment bears the burden of making a *prima facie* showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law." *Abbott*, 183 N.E.3d at 1079 (emphasis in original) (citing *Sargent v. State*, 27 N.E.3d 729, 731 (Ind. 2015)). Only if the movant meets this prima facie burden does the burden then shift to the

---

and then back up to the text." *Zimmerman v. Ind. Fam. & Soc. Servs. Admin.*, 264 N.E.3d 712, No. 24A-PL-1281, slip op. at *1 n.1 (Ind. Ct. App. June 25, 2025) (mem.), *trans. denied*, 271 N.E.3d 1122 (Ind. 2025).

nonmovant to "come forward with contrary evidence showing an issue for the trier of fact." *Abbott*, 183 N.E.3d at 1079 (citing *Hughley*, 15 N.E.3d at 1003). We resolve "[a]ll factual inferences and all doubts as to the existence of a material issue" in favor of the nonmovant. *Zaragoza v. Wexford of Ind., LLC*, 225 N.E.3d 146, 151 (Ind. 2024) (internal quotation marks omitted) (quoting *Reed v. Reid*, 980 N.E.2d 277, 285 (Ind. 2012)). In so doing, "we give careful scrutiny to make sure the non-movant's day in court is not improperly denied." *Id.* (internal quotation marks omitted) (quoting *Siner v. Kindred Hosp. Ltd. P'ship*, 51 N.E.3d 1184, 1187 (Ind. 2016)).

[9] Keisler specifically contends the trial court erred by denying the Motion because she is entitled to recover damages for the Emotional Distress Claim separately from the damages she has already recovered for the Wrongful Death Claim. This argument requires interpretation of the MMA, which is a legal question we review de novo. *Gierek*, 250 N.E.3d at 384 (citing *Budden v. Bd. of Sch. Comm'rs of City of Indianapolis*, 698 N.E.2d 1157, 1160 (Ind. 1998)). In interpreting the MMA's provisions, we must "give effect to every word and 'eschew those [interpretations] that treat some words as duplicative or meaningless.'" *Cutchin v. Beard*, 171 N.E.3d 991, 997 (Ind. 2021) (alteration in original) (quoting *Estabrook v. Mazak Corp.*, 140 N.E.3d 830, 836 (Ind. 2020)). We also give the words and phrases used "their plain, or ordinary and usual," meaning. I.C. § 1-1-4-1(1); *see also Morales v. Rust*, 228 N.E.3d 1025, 1054 (Ind. 2024) (quoting *ESPN, Inc. v. Univ. of Notre Dame Police Dept.*, 62 N.E.3d 1192, 1195 (Ind. 2016)), *reh'g denied* (Apr. 22, 2024), *cert. denied*, 145 S. Ct. 177 (2024).

"[W]e presume the legislature desired for its language to be applied in a rational and logical manner that faithfully reflects the statute's central policy aims and objectives." *Loomis v. ACE Am. Ins. Co.*, 244 N.E.3d 908, 915 (Ind. 2024) (citing *Nicoson v. State*, 938 N.E.2d 660, 663 (Ind. 2010)).

[10] Before we address the merits of Keisler's claims, we first review the history surrounding the MMA.

> In the years leading up to the MMA's enactment in 1975, Indiana's health care system was on the verge of a crisis. Lawsuits for malpractice claims had grown precipitously since the Second World War—the result of increased expectations of care from patients and a general breakdown in rapport between doctors and patients. This growth in litigation, combined with a ballooning of damage awards and a corresponding rise in malpractice-insurance premiums, prompted many doctors to reduce the services they offered, refuse to perform high-risk procedures, or leave their profession altogether.
>
> To reverse this trend, the MMA created measures to mitigate the cost of insuring and defending malpractice claims. Specifically, the Act imposed a damages award cap, a restrictive statute of limitations, and an attorney fee limitation. . . .
>
> [I]n its findings that led to the Act's passage, the legislature cited the increase in suits and claims for damages arising from professional patient care and the corresponding increase in cost of providing health care services.

*Gierek*, 250 N.E.3d at 391–92 (emphases omitted) (internal citations and quotation marks omitted); *see also Allen v. Anonymous Physician*, 274 N.E.3d 124, 126 (Ind. 2026) (Molter, J., respecting the denial of transfer). "It is beyond

debate that the cap on recoveries under the Act is an integral part of the legislative scheme." *Patel v. Barker*, 742 N.E.2d 28, 35 (Ind. Ct. App. 2001) (Friedlander, J., dissenting).

[11] Turning now to the merits, "the MMA covers **all** claims for 'malpractice' by a 'patient' against a 'health care provider' (as those terms are defined in the Act)," *Gierek*, 250 N.E.3d at 385 (emphasis in original), including claims for "negligent infliction of emotional distress, if arising from alleged medical malpractice," *id.* at 390 (quoting *Spangler v. Bechtel*, 958 N.E.2d 458, 472 (Ind. 2011)). If a patient files a complaint with a claim that falls within the definition of "malpractice," the MMA limits the damages that qualified health care providers are required to pay. I.C. § 34-18-14-3(b). When a qualified health care provider "has agreed to settle its liability on a claim" for the maximum amount, the patient can petition for additional compensation from the Fund. *Id.* § 34-18-15-3. As relevant here, the MMA limits the "total amount recoverable for an injury or death of a patient" to $1,650,000 "for an act of malpractice." *Id.* § 34-18-14-3(a)(4).

[12] The parties do not dispute the facts as set forth in Keisler's settlement agreement with the providers and recited above. And the parties agree that the Emotional Distress Claim is compensable. Where the parties diverge is whether Keisler's Emotional Distress Claim damages are included in or separate from her Wrongful Death Claim damages. That is, can Keisler recover an additional $1,650,000 for the Emotional Distress Claim? Resolution of this question turns on whether Keisler was a traditional or third-party patient.

There are two categories of "patient":  (1) a "traditional patient," who has "a direct relationship with a healthcare provider," and (2) a third-party patient, who has "a claim against a provider for malpractice to a traditional patient." *Lake Imaging, LLC v. Franciscan Alliance, Inc.*, 182 N.E.3d 203, 208 (Ind. 2022) (quoting *Cutchin*, 171 N.E.3d at 995); *see also* I.C. § 34-18-2-22.  Stated differently, a traditional patient is "the actual victim of the malpractice" and a third-party patient is not.  *Ind. Patient's Comp. Fund v. Butcher*, 863 N.E.2d 11, 19 (Ind. Ct. App. 2007) (quoting *Goleski v. Fritz*, 768 N.E.2d 889, 891 n.1 (Ind. 2002)), *disapproved of on other grounds by Robertson v. B.O.*, 977 N.E.2d 341, 345 n.2 (Ind. 2012).

Recovery under the MMA is limited to "the number of injuries or death 'suffered by the *actual victim of the malpractice*,'" that is, the number of injuries or death suffered by the traditional patient.  *Butcher*, 863 N.E.2d at 19 (Ind. Ct. App. 2007) (emphasis in original) (quoting *Goleski v*, 768 N.E.2d at 891 n.1).  The MMA's statutory cap applies "to all claims, whoever may assert them, for a single injury or death of a patient."  *Spangler*, 958 N.E.2d at 472 n.8.  Accordingly, a third-party patient may assert medical malpractice claims on behalf of herself and a traditional patient, but the actual recovery for those claims is limited to the number of injuries or death suffered by the traditional patient.  *Butcher*, 863 N.E.2d at 19; *Goleski*, 768 N.E.2d at 891 n.1.

For example, in *Indiana Patient's Compensation Fund v. Butcher*, a child's parents sought to recover damages for the child's death and their emotional distress. 863 N.E.2d at 13, 16.  The trial court determined that the parents were entitled

to recover under three separate statutory caps—one for the child's death, one for the mother's emotional distress, and one for the father's emotional distress. *Id.* at 13. This court reversed that decision because the child's parents were not "the actual victim of malpractice," the child was, so the parents' recovery was limited to one statutory cap—the cap for the child's death. *Id.* at 19–20.

[16] Similarly, in *Cutchin v. Beard*, the plaintiff sued a third party's health care providers under the MMA for the wrongful deaths of his wife and daughter, who were killed in a car wreck caused by the third party, who had been under the influence of prescribed opioids. 171 N.E.3d at 993–94. The plaintiff alleged the third party's providers committed malpractice regarding the third party's prescription. *Id.* at 994. The Indiana Supreme Court determined that the plaintiff was not a traditional patient because he did not have a patient-provider relationship with the third party's providers. *Id.* at 995. Instead, the plaintiff was a third-party patient because his wrongful death claims resulted from the providers' alleged malpractice to the third party, who was their traditional patient. *Id.* The Indiana Supreme Court further concluded that the MMA applies to third-party patients such as the plaintiff in *Cutchin*. *Id.* at 995, 997–98 (answering certified question from 7th Cir.).

[17] By contrast, in *McCarty v. Sanders*, Kerry Thomas was admitted to a medical center to deliver her child, Jacob. 805 N.E.2d at 897. The epidural administered to Kerry caused her to become unresponsive, and Jacob was eventually delivered by caesarian section. *Id.* Kerry died, and Jacob suffered permanent brain damage. *Id.* An expert opined that the epidural was

improperly administered, the medical center was inadequately staffed, and the obstetrician "took an 'inordinate amount of time' in performing" the caesarian section." *Id.* at 900. This court determined that "there was one continuous sequence of events that led to two separate injuries," *id.*, and affirmed the trial court's decision that Jacob was entitled to recover under a cap separate from the one applicable to his mother's death, *id.* at 897, 900–01.

[18] Keisler argues she "was a traditional patient" of Hendricks Regional Health because she "received medical care and treatment, as all mothers do, prior to, during, and after childbirth." Appellants' Br. at 27. Specifically, Keisler claims her "medical care and treatment included education and advice regarding lactation and breastfeeding," and Hendricks Regional Health "retained a continuing physician-patient relationship" with her because she "was instructed to call an HRH lactation specialist with any questions after discharge." *Id.* According to Keisler, the failure to inform her of Lilee's newborn test results also meant that her own health care plan was not properly modified, which resulted in Lilee's death. Keisler further explains that her "emotional distress does not arise from the death of Lilee, but instead arises from direct emotional harm she suffered from inadvertently causing Lilee harm by breastfeeding as a result of [Keisler]'s healthcare providers' medical malpractice." *Id.* at 37.

[19] Even as described by Keisler, the Emotional Distress Claim is inseparable from the Wrongful Death Claim. Both are premised on a failure to inform Keisler of Lilee's galactosemia that ultimately resulted in Lilee's death. No matter how the Emotional Distress Claim is framed, it is reliant on and arises out of the

Wrongful Death Claim. Assuming that Keisler is correct that she was a traditional patient of Hendricks Regional Health, her injury did not arise from the care she received; instead, it resulted from the care Lilee received. Appellants' Br. at 28–29; Appellants' App. Vol. II at 63–64, 66, 75, 79; *see Spangler*, 958 N.E.2d at 466 (citing *Atl. Coast Airlines v. Cook*, 857 N.E.2d 989, 998 (Ind. 2006)) (explaining a plaintiff may seek damages for emotional distress resulting from negligence under the bystander rule or the modified impact rule)[4]. Lilee was the victim of the malpractice, the traditional patient. Keisler's emotional distress arose from the malpractice Lilee suffered, making Keisler a third-party patient. *See* I.C. § 34-18-2-22 (providing "patient" includes "a person having a claim of any kind, whether derivative or otherwise, as a result of alleged malpractice"); *Spangler*, 958 N.E.2d at 472 ("Claims for negligent infliction of emotional distress, if arising from alleged medical malpractice, are subject to the MMA . . . because they are *'otherwise' a result of alleged malpractice*." (Emphasis in original).). Keisler's "inadvertent[]" participation in Lilee's death, Appellant's Br. at 37, does not change this analysis.

---

[4] The bystander rule provides that a plaintiff may seek damages for negligent infliction of emotional distress where she has "witnessed or come to the scene soon thereafter the death or severe injury of certain classes of relatives." *Spangler v. Bechtel*, 958 N.E.2d 458, 466 (Ind. 2011) (citing *Atl. Coast Airlines v. Cook*, 857 N.E.2d 989, 998 (Ind. 2006); *Groves v. Taylor*, 729 N.E.2d 569, 573 (Ind. 2000)). The modified impact rule provides that a plaintiff may seek damages for negligent infliction of emotional distress where she has "suffered a direct impact" that was "proximately caused by the defendant's breach of a legal duty" to either the plaintiff or to the third-party. *Id.* (citing *Cook*, 857 N.E.2d at 998; *Alexander v. Scheid*, 726 N.E.2d 272, 273–74, 284 (Ind. 2000); *Conder v. Wood*, 716 N.E.2d 432, 433, 435 (Ind. 1999); *Shuamber v. Henderson*, 579 N.E.2d 452, 453, 456 (Ind. 1991)).

And for these reasons, the facts of this case are much more analogous to those in *Butcher* and *Cutchin* than those in *Sanders*. Lilee died as a result of medical malpractice, which in turn injured Keisler by causing her emotional distress. Accordingly, Keisler's actual recovery for the Emotional Distress and Wrongful Death Claims are limited to one statutory cap for Lilee's death. *See Butcher*, 863 N.E.2d at 19; *Goleski*, 768 N.E.2d at 891 n.1.

We are not unsympathetic to the pain and suffering Keisler has experienced as a result of Lilee's death. But it is clear that recovery under the MMA is limited. *See generally Cutchin*, 171 N.E.3d at 998 (David, J., concurring in result) (condoning expansion of the MMA). We cannot ignore well-established precedent, *Martinez v. Smith*, 249 N.E.3d 1096, 1100 (Ind. Ct. App. 2024) (quoting *Fox v. Franciscan Alliance, Inc.*, 204 N.E.3d 320, 327 (Ind. Ct. App.), *trans. denied*, 220 N.E.3d 59 (Ind. 2023)), or the MMA's purpose, *Loomis*, 244 N.E.3d at 915 (citing *Nicoson*, 938 N.E.2d at 663). Because Keisler was not the actual victim of the malpractice in this case, she is a third-party patient and her total recovery is limited to one statutory cap for Lilee's death. Accordingly, the trial court did not err by denying the Motion, and we affirm that decision.

Affirmed.

Mathias, J., concurs.
May, J., dissents with a separate opinion.

ATTORNEYS FOR APPELLANTS

Hannah K. Brady
Michael E. Simmons
Hume Smith Geddes Green & Simmons, LLP
Indianapolis, Indiana

Andrea R. Simmons
Cohen & Malad, LLP
Indianapolis, Indiana


ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Evan Matthew Comer
Supervising Deputy Attorney General
Indianapolis, Indiana

**May, Judge, dissenting.**

Brittney Keisler did not merely witness her daughter's death. She caused it – unknowingly, unwillingly, and in direct reliance on medical instructions her own providers gave her and never corrected. That distinction, which the majority acknowledges in passing, is the reason I respectfully dissent.

The majority correctly states the governing framework: recovery under the MMA requires "injury or death suffered by the actual victim of the malpractice," *Ind. Patient's Comp. Fund v. Butcher*, 863 N.E.2d 11, 19 (Ind. Ct. App. 2007) (emphasis removed) (quoting *Goleski v. Fritz*, 768 N.E.2d 889, 891 n.1 (Ind. 2002)), *disapproved on other grounds by Robertson v. B.O.*, 977 N.E.2d 341, 345 n.2 (Ind. 2012), and a single statutory cap of Fund monies covers "all claims, whoever may assert them, for a single injury or death of a patient." *Spangler v. Bechtel*, 958 N.E.2d 458, 472 n.8 (Ind. 2011) (quoting *Butcher*, 863 N.E.2d at 10). Where I part ways with the majority is in its conclusion that Brittney is **only** a third-party patient asserting a derivative claim through Lilee's death. On the facts of this case, she is **also** something the prior cases in this line have never addressed: a traditional patient whose own providers' breach of a duty owed directly to her made her the unwitting physical instrument of her daughter's death.

# I. Factual Origin of Brittney's Claim

The malpractice in this case has a two-part structure that is central to understanding why Brittney is not only a grieving parent asserting a derivative claim.

Part One occurred while Brittney was receiving inpatient care from the providers after giving birth to Lilee. The providers' lactation staff gave Brittney an affirmative medical instruction – to breastfeed her baby – as part of her postpartum care. This was advice directed at Brittney, as the providers' patient, about what she should do with her own body. When Brittney left the hospital on October 31, that instruction remained in place, and she was following it.

Part Two occurred on November 3, when the providers received Lilee's genetic testing results, which indicated she had galactosemia. At that moment, they held clinical information that rendered dangerous the lactation instruction that they had given to Brittney as their patient. The duty that arose was not only to treat Lilee's galactosemia. It was also – and separately – to update an ongoing medical instruction that the providers had given to Brittney as their own patient and that Brittney was continuing to follow. Dr. McIntire attempted to reach Brittney that day and failed. No one reached her. Brittney continued breastfeeding for two more days in direct and reasonable reliance on an operative medical instruction that her providers knew needed to change but that they never corrected.

[28] Every feeding from November 3 onward was a physical act by Brittney, performed in reliance on her providers' operative instruction, made harmful by their failure to complete the required notification. This is not the causal structure of a bystander claim. It is the causal structure of a patient injured by her own providers' breach of a duty owed directly to her.

[29] That distinction matters because the number of available statutory caps for recovering monies from the Fund turns on the number of actual victims of malpractice. A third-party patient asserting a claim through the traditional patient's injury draws from the traditional patient's cap. A second traditional patient with a direct-duty injury of her own is an actual victim in her own right and, under *McCarty v. Sanders*, 805 N.E.2d 894, 897 (Ind. Ct. App. 2004) (hereinafter *Sanders*[5]), *trans. denied*, is entitled to a separate statutory cap of Fund monies. Whether Brittney is a third-party patient or a traditional patient depends on whose injury her claim is grounded in. The two-part structure of the malpractice experienced by Brittney demonstrates her claim is grounded in her own injury as a traditional patient.

---

[5] Prior cases have referred to this case as "*McCarty*." *See*, *e.g.*, *Butcher*, 863 N.E.2d at 19. The majority herein uses "*Sanders*." *See*, *e.g.*, Majority op. at 13. We follow the majority's lead.

## II. Placement of Brittney's Claim within Jurisprudence

[30] The majority concludes that "the facts of this case are much more analogous to those in *Butcher* and *Cutchin* than those in *Sanders*." Majority op. at 13. I disagree.

[31] Dorothy Butcher performed no act in reliance on her providers' guidance that contributed to her son's death. 863 N.E.2d at 13 (stating operative facts). She was passive throughout the relevant events – she was assessed, transferred, and operated upon. The malpractice happened around her and impacted her son. *Id.* at 15-16. Nothing about Dorothy's own medical care made her an instrument of the harm that killed her son. Because her only claim was for grief at the loss of her child, she could not claim a second cap of monies from the Fund. *Id.* at 20.

[32] *Cutchin* is even more readily distinguished. There, the plaintiff had no relationship whatsoever with the negligent providers – his claims arose entirely from their malpractice to a third party who was their patient and whose impaired driving killed the plaintiff's family members. *Cutchin*, 171 N.E.3d at 994. He was a stranger to the providers, asserting injuries that flowed entirely through another person's treatment by those providers. Herein, however, Brittney was not a stranger to the providers. She was their patient. Placing her in the same category as the *Cutchin* plaintiff – someone with no direct relationship to the negligent providers – grossly mischaracterizes the facts of either this case or *Cutchin*.

[33] Brittney's factual circumstances are different from those cases in a way that matters. Her own medical care – the lactation instruction the providers gave her as their inpatient – was the mechanism through which Lilee received galactose over those critical five days. The providers did not merely fail to treat Lilee. They gave Brittney an operative medical instruction and then, when that instruction became dangerous, failed to correct it. Brittney acted on it. She was active, not passive, and she was active because her own doctors told her to be.

[34] In *Sanders*, mothers and their unborn children suffered distinct, independently provable physical injuries from the malpractice that occurred. 805 N.E.2d at 900-901 (holding "there was one continuous sequence of events that led to two separate injuries" – one to a mother and another to her unborn son). Our court held that each actual victim of the act of malpractice could recover a separate statutory cap from the Fund. *Id*. at 899. The *Butcher* court approved *Sanders* holding because more than one actual victim had existed. 863 N.E.2d at 19.

[35] Brittney's circumstances present the same two-patient, two-injury configuration: Lilee suffered death from untreated galactosemia; Brittney suffered a distinct injury – the specific trauma of having been made the unwitting physical instrument of her daughter's death through ongoing compliance with the providers' medical instruction – from her own providers' breach of a duty owed directly to her. Both are patients. Both have qualifying injuries. The distinction is that Brittney's injury is emotional rather than physical.

[36] I acknowledge that no Indiana court has held that a traditional patient's purely emotional injury qualifies as a separate "injury of a patient" under Section 34-18-14-3(a) when another patient died in the same event. Extending *Sanders* to reach that conclusion is a step, and I say so plainly.[6] But nothing in the Indiana Supreme Court's holdings forecloses it. The MMA defines "patient" broadly to include "a person having a claim of any kind, whether derivative or otherwise, as a result of alleged malpractice." Ind. Code § 34-18-2-22. Brittney's claim is not derivative. It is grounded in a duty the providers owed to her.

[37] The injury Brittney suffered is also not reducible to only parental grief, and the distinction matters. Parental grief from the loss of a child arises from the child's death. Brittney's separate injury arises from the acts she performed – in reliance on an instruction the providers gave her and failed to retract – that made her the vehicle of Lilee's harm. Brittney's Reply Brief frames the distinction precisely:

---

[6] The direct-duty theory this dissent applies is not a novel proposition. California allows a "direct victim" claim for negligent infliction of emotional distress, without any physical injury requirement, wherever a defendant negligently breaches a duty arising from a preexisting relationship with the plaintiff. *Burgess v. Superior Court*, 2 Cal.4th 1064, 1074 (1992). Under that framework, the distinction between a bystander and a direct victim turns not on proximity to the harm or relationship to the deceased, but on the source of the duty owed. California has applied this principle even where the child died rather than survived the providers' negligence, holding that the direct victim theory rests on the preexisting physician-patient relationship with the mother and is not limited to cases of live birth. *Zavala v. Arce*, 58 Cal.App.4th 915, 933 (1997). California has not had occasion to address the downstream question presented here – how a statutory cap structure applies when a mother's direct-duty injury is recognized – because neither operates under a scheme equivalent to Indiana's MMA. The relevance of these cases is not that they resolve the cap question, but that they confirm the threshold premise: a mother who received affirmative medical instructions from her own providers, continued to act on those instructions in direct reliance, and suffered severe emotional harm from the providers' failure to correct them would not be characterized as a bystander asserting a derivative claim. She would be a direct victim asserting an injury of her own. That threshold question – whether Brittney's injury is hers alone – is what drives the cap analysis under *McCarty*. It is also the question Indiana courts have never decided in a case with the current factual configuration.

had Lilee survived but suffered severe organ damage from untreated galactosemia, Brittney would still have suffered the same injury from having breastfed her daughter on medical advice that was never corrected. (*See* Reply Br. at 10.) That injury does not depend on Lilee's death. It depends on the providers' breach of their duty to Brittney.

## III. Conclusion

[38] I would reverse and remand for entry of judgment in Brittney's favor on the statutory cap question because Brittney not only was a third-party patient based on the death of Lilee but also was an actual victim of malpractice committed by providers who owed a duty to her as their patient. Accordingly, I dissent.